639 So.2d 216 (1994)
Rosa Mae AMBROSE, et al.
v.
NEW ORLEANS POLICE DEPARTMENT AMBULANCE SERVICE, et al.
Nos. 93-C-3099, 93-C-3110 and 93-C-3112.
Supreme Court of Louisiana.
July 5, 1994.
Rehearing Denied September 15, 1994.
*217 Kathy Lee Torregano, City Atty., Philip C. Ciaccio, Jr., Earl G. Perry, Jr., for applicant.
David Wallace Oestreicher, II, James E. Uschold, Oestreicher & Hackett, Richard Allen Thompson, Thompson & Lavender, Hon. Mack E. Barham, Robert E. Arceneaux, Gail N. Wise, Barham & Arceneaux, Margaret E. Bradley, for respondent.
Lawrence S. Kullman, David Robert Jefferson, for amicus curiae, Trial Lawyers Ass'n.
CALOGERO, Chief Justice.[*]
In this wrongful death and survival action against two New Orleans Police Department emergency technicians asserting gross negligence, which purportedly reduced a heart attack victim's chance of survival, a jury in Civil District Court, Orleans Parish, rendered a verdict for plaintiff, and the court of appeal affirmed. Plaintiffs were required to prove gross negligence, not negligence alone, because of the qualified statutory immunity afforded emergency medical technicians by R.S. 40:1235.
What prompted the Court's granting the writ sought by Duncan Lill, Timothy Dodson, and the City of New Orleans were two considerations: (1) the set of facts surrounding the incident suggested the likelihood that, even giving proper deference to the *218 factfinder, the jury's verdict was not supported by the evidence; and (2) the jury's quantum award should probably have been a lesser sum than actually awarded in light of the fact that plaintiffs proved only a loss of a chance of survival rather than that death was caused by defendants' action. After briefing, argument, and study of the record, we conclude that the plaintiffs did not prove by a preponderance of the evidence that the emergency medical technicians' acts constituted gross negligence, and further that the jury's decision to the contrary was clearly wrong. That being the case, we need not address the quantum assessment for loss of a chance of survival.
The facts in the case are not in dispute. Wilton J. Ambrose, Jr., a fifty-eight-year-old man with a history of diabetes, circulatory and respiratory problems, awoke at approximately 1:45 a.m. in the morning of July 18, 1983, "not feeling well." About 2:00 a.m., Mr. Ambrose told his wife to call to the house his two adult daughters, Gail Ray and Linda Thomas, and their husbands. Gail Ray and her husband, Willie, arrived first about ten minutes later and helped Ambrose from the bathroom to the bedroom, where they sat him on a chair. Ambrose told Ms. Ray that he wanted an ambulance and oxygen. Ms. Ray called two ambulances, one from Medic One and one from the New Orleans Police Department ("NOPD"). An NOPD ambulance run report reflects that the call came in at approximately 2:57 a.m. Linda Thomas and her husband, Hudson, arrived at the Ambrose house about that time.[1] The Medic One ambulance arrived at approximately 3:00 a.m., shortly after Medic One had arrived. The Medic One emergency medical technicians ("EMT") were certified only as basic EMTs, whereas the NOPD EMTs, Timothy Dodson and Duncan Lill, were certified as intermediate EMTs. National EMT operating procedures mandate that where both basic and intermediate personnel are available, the intermediate EMTs are to take over. Accordingly, NOPD EMTs Lill and Dodson took charge at the Ambrose house. After being apprised by Medic One that they had been unable to obtain an adequate medical history or vital signs, Dodson sought to take Mr. Ambrose's vital signs, and Lill questioned the family members present as to the patient's medical history.
While Dodson continued to try to find a pulse sufficient to take Ambrose's blood pressure, Lill brought in the ambulance stretcher. Lill determined that the stretcher could not make the turn from the living room to the bedroom, where Mr. Ambrose was seated in a chair.[2] Gail Ray and Linda Thomas suggested the stretcher could be brought through the kitchen into the bedroom, but Lill said the stretcher would not fit through the doorway or maneuver the corridor. Lill admitted that he made no attempt to get the stretcher through the door, but rather made the judgment that it would not fit. Lill suggested that the two sons-in-law lift Ambrose under his arms and walk him to the stretcher, approximately ten to twelve steps away. Once Ambrose was situated on the stretcher, with the oxygen tank between his legs, he was placed in the ambulance, and the stretcher was secured. Mr. Ambrose then stopped breathing, and his son-in-law, Hudson Thomas, who was a respiratory therapist, began CPR, while Lill inserted an esophageal obdurator into the airway, using an ambao bag, to respirate Mr. Ambrose. The ambulance arrived at Jo Ellen Smith Hospital somewhere between 3:20 and 3:24, approximately four to five minutes after leaving the Ambrose house. Mr. Ambrose expired and was pronounced dead at 3:52 a.m.
Plaintiffs, Mrs. Ambrose, Gail Ray, Linda Thomas, and Warren Ambrose[3] filed a *219 wrongful death and survival action against the "NOPD Ambulance Service" and EMTs Lill and Dodson, alleging that the actions of Lill and Dodson in spending approximately twenty minutes at the Ambrose house and in having Mr. Ambrose assisted to the stretcher, rather than the stretcher taken to him, constituted gross negligence. They assert that these acts and omissions resulted in the loss of a chance of survival[4] for Mr. Ambrose. The trial jury found that the conduct of EMTs Lill and Dodson amounted to gross negligence and awarded to Mrs. Ambrose $475,000, to Gail Ray and Linda Thomas $25,000 each, and to Ambrose's estate $115,000. The court of appeal reduced the trial court's award for Mr. Ambrose's pain and suffering from $115,000 to $75,000 and awarded Warren Ambrose $12,500.
Liability of the EMTs Lill, Dodson, and the City of New Orleans, operator of the NOPD Ambulance Service, is governed by LSA-R.S. 40:1235 A(1), which provides:
Any basic, intermediate, or paramedic medical technicians certified pursuant to the terms of this Part who render emergency medical care to a person while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such a person for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such person....
The immunity granted herein to basic, intermediate, and paramedic emergency medical technicians by the provisions of this Part shall extend to parish governing authorities, police departments, sheriffs' offices, fire departments, or other agencies engaged in rendering emergency medical services and its insurers with respect to such emergency medical services unless the emergency medical technician employed by said agencies would be personally liable under the provisions of Paragraph 1.
In order to prevail, plaintiffs must prove that the EMTs owed a duty to Ambrose, that the EMTs' acts or omissions caused his death or were the cause in fact of Ambrose's loss of a chance of survival, and that the EMTs' acts or omissions were either intended to inflict harm or were grossly negligent. It is not enough for plaintiffs to prove simply that the EMTs acted negligently. Plaintiffs here must prove that defendants' actions or omissions were grossly negligent or intentionally designed to harm. The law, as required by the above quoted statute, thus accords emergency medical personnel a limited immunity from civil damages.
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (La. 1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, *220 amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed. 1984); 65 C.J.S. Negligence, § 8(4)(a), at 539-40 (1966 & Supp.1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214)). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
After all the evidence had been presented, the trial judge charged the jury. Near the beginning of the charge, she instructed that plaintiffs had to prove by a preponderance of the evidence the "negligence" of defendants and that the death was caused by defendants' "fault." She thereupon distinguished between direct and circumstantial evidence. In discussing proximate cause, she referred to a more likely than not burden to prove that the "negligence" or "fault" of defendants played a substantial part in causing the injury suffered by plaintiffs, then later referred to "a wrongful act" and "establish[ing] negligence or liability." Sandwiched between the various references to plaintiffs' burden to prove "negligence," the court read to the jury LSA-R.S. 40:1235 regarding the EMTs civil immunity. The court gave no further explanation of the qualified immunity extended to EMTs and no explanation or instruction on gross negligence. The jury interrogatories did ask, separately, whether Lill's acts or omissions and Dodson's acts or omissions resulted in harm to Ambrose and whether Lill's acts or omissions and Dodson's acts or omissions were grossly negligent. The jury's answer to each question was in the affirmative. Gross negligence was plaintiffs' burden to prove, and the jury was ultimately asked if plaintiffs had met that burden. This was the very reason why the jury was in need of a fair and clear instruction on what constitutes gross negligence and how plaintiffs must prove gross negligence in order to recover damages. No definition of gross negligence was given by the court. That absence from the charge would take on less significance (perhaps the jury could understand the meaning from the very words "gross" and "negligence") if it were not for the inclusion within the charge of four or five distinct references simply to negligence and fault. Under these circumstances, where a standard instruction for negligence was repeatedly given, where there was no explanation of plaintiffs' burden to prove gross negligence and no definition or explanation of gross negligence, notwithstanding that R.S. 40:1235 was read to the jury, the jury instructions as a whole were at least arguably seriously misleading. Nonetheless, because the court read the statute, LSA-R.S. 40:1235 A(1), to the jury, and because defendants' attorney no doubt argued the importance of the jury's finding gross and not merely simple negligence, it is difficult to conclude that erroneous jury charges should dispense with the clearly wrong standard of review.
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this Court held that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333. More recently, regarding this constitutional appellate review of fact in civil cases, La. Const. art. 5, § 10, we have had occasion to say in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), a case which involved the review of damages, that "the discretion vested in the trier of fact is `great,' and even vast," and in Stobart v. State, 617 So.2d 880, 882-83 (La.1993), which involved the standard of review of findings of fact, a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and *221 "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. In each of these cases there was but a perpetuation of the principle set down in Arceneaux.
Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts.[5] Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.[6]
We revert here to the plaintiffs' case in support of their preponderance burden to establish gross negligence on the part of the EMTs. Plaintiffs' contention regarding gross negligence was that the EMTs failed to take the stretcher to Mr. Ambrose. Each plaintiff testified that Mr. Ambrose was made to walk, assisted by his two sons-in-law, because the EMTs determined that the stretcher could not make the right-hand turn from the living room into the bedroom where Ambrose was sitting in a chair. Gail Ray testified that she told Lill of an alternate route for the stretcher to reach the bedroom and her father, namely that he could take the stretcher into the kitchen, "turn the stretcher and [go] straight into my parents' bedroom because it's directly in line with the kitchen door." When asked if the stretcher would have had to make a dog-leg right turn to get into the kitchen, Mrs. Ray answered yes. Mrs. Ray admitted that Lill told her that taking the stretcher through the kitchen and into the bedroom "couldn't be done. He said, `You can't get it through this door, and you can't get it through there, just leave it in the living room.'" It is evident that Lill's decision was the result of at least his effort at a reasoned judgment call. He might conceivably have been wrong. But surely he did not act precipitously or arbitrarily or with gross disregard for the consequences. And there is no contrary evidence in the record.
Of course, Dr. James Shewmaker, plaintiffs' expert in pre-hospital care, did testify that "there is no question in [his] mind that a standard ambulance cot or gurney could enter this front door, gone through this opening from the living room into the kitchen area, then turn left [into] the kitchen area, and enter the hallway." Uncontroverted testimony established that the particular stretcher used by the NOPD Ambulance Service, however, both at the time they were called to the Ambrose house and currently, is six to eight inches longer than the standard stretcher used by other ambulance services. When asked why he did not follow the suggestion offered by Mr. Ray to take the stretcher through the kitchen to the bedroom, which would have eliminated the need for Ambrose to walk assisted ten to twelve steps, Lill explained. "I had to accompany Mrs. Ambrose into the kitchen to get the *222 medications, and at that point I had visually seen the route they were attempting. The problem was still the making of the sharp curb [sic], and I believed at that point that our long stretcher would not make that turn." When probed why he did not even attempt to take the stretcher that way, Lill answered: "I felt at that time that [trying] would be wasting precious time. We obviously had a patient that needed to be moved as expeditiously as possible, and I did not want to take the chance of getting the stretcher stuck, which would have been obviously a long delay, or possibly if we could get it in and had the patient on it and had to maneuver the stretcher in an odd way, possibly the patient could fall or it could endanger the patient."
Defense expert Dr. Norman McSwain, testifying on the appropriate standard of care by EMTs in answering emergency calls, emphatically stated that EMTs must assess the circumstances faced in each emergency call and make a judgment call as to the best way to get the patient to the hospital. "I expect the EMTs to always think and in thinking they've got to decide what's best for their patient with the environment and everything that surrounds them at that time." He testified that the EMTs should exercise a judgment call about how best to get the patient to the ambulance and that it was not unusual to ask a cardiac patient to be asked to walk or walk with assistance to the stretcher or all the way to the ambulance.
The record does not support a conclusion that the EMTs' were grossly negligent in their judgment or in any other conduct at the scene of the emergency. Lill and Dodson, having determined that the longer stretcher used by the service could not be taken to Mr. Ambrose so that he could be moved out on the stretcher, made a second judgment call that it would be best for Mr. Ambrose to be brought to the stretcher by his two sons-in-law. Having Mr. Ambrose walk, heavily supported by two grown men, ten to twelve steps under these circumstances does not rise to the level of gross negligence. Nor was any testimony offered at trial unequivocally reciting that these steps taken by Mr. Ambrose, while being all but carried by his sons-in-law, either caused or exacerbated his heart attack.
Plaintiffs also contend that Lill and Dodson spent twenty minutes at the Ambrose house before actually leaving with Mr. Ambrose, allegedly a time so long that it evidences gross negligence. The record reflects some confusion about exactly how long the NOPD EMTs spent at the Ambrose home. Mrs. Ray testified that Lill and Dodson were there for twenty minutes. Hudson Thomas, Mr. Ambrose's son-in-law, stated that NOPD was on the scene between fifteen and twenty minutes, and Lill testified that they were there between ten and fourteen minutes. Even the ambulance run report and the hospital records reflected something different. The ambulance run report states that the emergency call came in at 2:57 a.m., the ambulance arrived at the Ambrose house at 3:00 a.m. and left at 3:20, and arrived at the hospital at 3:24 a.m. The hospital records reflect that the ambulance arrived at 3:20 a.m. Even if we concede the worst-case scenario for defendantsthat they were at the Ambrose house for twenty minutesit does not mandate a finding of gross negligence in favor of plaintiffs. Additionally, Shewmaker's opinion that the EMTs should not have spent more than ten to twelve minutes at the cardiac emergency scene does not alone make plaintiffs' case. Even Shewmaker conceded that each case is different. Furthermore, these EMTs had numerous tasks to perform: they took vital signs, took a medical history, and started oxygen, all of this in a tense and crowded circumstance. The technicians performed no other unauthorized tasks, and they did not fail to perform the necessary ones. Plaintiffs do not assert that the technicians intentionally acted to harm Mr. Ambrose. Rather, plaintiffs' allegation is of gross negligence and rests on their assertion that the technicians spent too long at the scene before taking Mr. Ambrose to the hospitaltwenty minutes instead of ten to twelve. When asked if there is a recognized standard or guideline that establishes the length of time EMTs should spend at a cardiac emergency site, Shewmaker responded: "I don't know of anyone in this field that would attempt to set a time. You can't cookbook the delivery of hospital care. *223 Every case is different." Thus even plaintiffs' expert admitted that although in his opinion ten minutes at the scene may have been ideal, or expected, every case presents a different problem for the EMTs must. In this case, the EMTs were confronted with a man who seemingly had symptoms of a heart attack, but whose medical history established a history of respiratory problems. No one at the house that night was able to give the EMTs a thorough history. Yet it was critical that the EMTs determine to the best of their ability whether to administer a low or a high level of oxygen or risk serious consequences to Mr. Ambrose. Making such a determination in the face of incomplete information from family members added to the time spent at the Ambrose home.
Plaintiffs' expert Shewmaker discussed the importance of using caution in assessing a patient's symptoms and medical history before beginning to administer oxygen, because respiratory patients receive one level of oxygen while cardiac patients receive a higher level. To administer a higher level of oxygen to a respiratory patient could be fatal. Accordingly, it was very important for Lill and Dodson to determine accurately both Mr. Ambrose's symptoms and his medical history. Where the plaintiffs' own expert (on whom plaintiffs relied to establish that spending twenty minutes constituted gross negligence) postulated on the one hand that no more than ten to twelve minutes should have been spent at the Ambrose home, but admitted on the other hand that each case is different and that no standard guideline has been established precisely because each case is different, Lill and Dodson cannot fairly be said to have been guilty of gross negligence. The plaintiffs failed to prove by a preponderance of the evidence that Lill's and Dodson's actions constituted gross negligence. The actions of the EMTs do not exhibit willful, wanton, or reckless conduct amounting to "complete neglect of the rights of others," nor an "extreme departure from ordinary care," nor the "want of even slight care." The decision of the jury and the corresponding judgment of the trial court, finding Lill and Dodson guilty of gross negligence, was clearly wrong.
For the above reasons, we conclude that plaintiffs did not meet their burden of proof at trial that EMTs Lill and Dodson committed gross negligence in their care of Wilton J. Ambrose, Jr. Accordingly, the judgments of the trial court and court of appeal are reversed.

DECREE
JUDGMENTS OF THE COURT OF APPEAL AND THE DISTRICT COURT REVERSED; PLAINTIFFS' PETITION DISMISSED WITH PREJUDICE AT PLAINTIFFS' COST.
ORTIQUE, J., concurs in result and assigns reasons.
KIMBALL, J., concurs for reasons assigned by ORTIQUE, J.
LEMMON, J., concurs and assigns reasons.
ORTIQUE, Justice, concurring.
I concur in the result reached by the majority.
It is a question of law whether plaintiffs' evidence is sufficient to prove gross negligence. Herein, even when all evidence is viewed in the light most favorable to plaintiffs, the trial evidence falls short of minimum legal requirements for proving that the actions of defendant EMTs constituted gross negligence. Because the totality of the evidence relating to gross negligence is legally insufficient, the actual factual findings of the jury on that evidence are immaterial to our appellate review.
LEMMON, Justice, concurring.
I agree with the result reached by the majority. However, I disagree that the issue of the sufficiency of the evidence should be determined solely by reference to the manifest error rule.
The manifest error rule is a standard used by appellate courts to resolve conflicting factual evidence; it is not a standard for determining sufficiency of the evidence. The manifest error rule relates purely to questions of fact; sufficiency of the evidence, on *224 the other hand, is a question of law, and the standard for determining sufficiency of the evidence relates to questions of law, or to mixed questions of law and fact.
In application, the manifest error rule becomes part of the standard for determining sufficiency of the evidence. The reviewing court first resolves any factual conflicts by application of the manifest error rule which dictates that the appellate court should not disturb the express or implied factual findings of the trier of fact.[1] Accordingly, the reviewing court views all evidence in the light most favorable to the party who prevailed in the trial court, and then determines whether the evidence, consisting of the undisputed facts and of the disputed facts thus viewed under the manifest error rules, was sufficient to preponderate in favor of a conclusion that the plaintiff had proved every element of his cause of action.
There were very few factual disputes in the present case, but deference must be accorded to the factfindings of the trier of fact. Using the appropriate standard for determining the sufficiency of the evidence and resolving conflicting factual disputes and inferences of fact in favor of plaintiffs, I conclude that a reasonable juror could not have determined on the evidence in this record, even when viewed in the light most favorable to plaintiffs, that gross negligence had been proved by a preponderance of the evidence.
NOTES
[*] Watson, J., not on the panel. Rule IV, Part 2, § 3. Charles A. Marvin, C.J., Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis.
[1] A grandchild of the Ambroses was staying with them, and he was also present in the Ambrose living room during the emergency.
[2] The Ambrose home is not a typical New Orleans shotgun house, where one room opens onto another in a straight line. Rather, the home apparently has a lateral hallway directly behind the living room leading from the kitchen to the bedroom past a living room door. Moving from the bedroom into the living room therefore involved a difficult turn from the hallway into the living room.
[3] Joining the Ambrose widow and two adult married daughters in filing suit was Warren Ambrose, a son who did not testify or make an appearance at trial. Defendants moved for a directed verdict on Warren Ambrose's claim, which the trial court granted, because there had been no testimony at all concerning the relationship between the decedent and his son for the jury to consider in making an award. The trial court reasoned that the nature of the relationship would, therefore, be speculative, and any award based on speculation would be erroneous. On appeal, the Fourth Circuit noted that the testimony of other family members concerning the relationship between all the family members established evidence of a strong loving family. The court of appeal reasoned that the minimal evidence presented established that "Warren Ambrose suffered some measure of grief and loss of love and affection." Ambrose v. New Orleans Police Department Ambulance Service, 627 So.2d 233, 246 (La.App. 4th Cir.1993).
[4] This Court has at least twice addressed loss of a chance of survival. In Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986), we held that it was unnecessary for plaintiff to prove that the patient would have survived had proper treatment been given. Rather, plaintiffs had the burden to prove that the patient had a chance of survival and that the improper treatment caused a loss of that chance. In Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991), we held that the plaintiff did not have to shoulder the burden of proving that the physician's malpractice was the cause in fact of the patient's death, but rather that the physician's malpractice resulted in loss of chance of survival. Our Court has not yet addressed the proper measure of damages to be awarded where a plaintiff has proven only the loss of a chance of survival.
[5] The Louisiana Constitution, article 5, § 10(B), provides:

Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts.
The Louisiana Constitution, article 5, § 5(C), provides:
Except as otherwise provided by this constitution, the jurisdiction of the supreme court in civil cases extends to both law and facts.
[6] The majority is cognizant but not in agreement with the contrary opinion expressed by the three concurring justices. They contend that this is not a manifest error case, but rather one involving sufficiency of the evidence. The jury in this case weighed the evidence and drew its conclusion as to whether plaintiffs established by a preponderance of the evidence that the EMTs' action constituted gross negligence. Our role as an appellate court, however, is simply to determine whether they were clearly wrong in that conclusion that gross negligence was proven by a preponderance.
[1] Thus, while there was evidence that the EMTs spent between ten and twenty minutes at the Ambrose home, the jury implicitly found the greater period of time, and the manifest error rule requires the appellate court to give deference to that finding. As stated in Canter v. Koehring Co., 283 So.2d 716 (La.1973):

When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.