646 So.2d 461 (1994)
Michael J. DUPRE
v.
INSURANCE COMPANY OF NORTH AMERICA, McDermott Incorporated, et al.
No. 93-CA-2125.
Court of Appeal of Louisiana, Fourth Circuit.
November 17, 1994.
Writ Granted March 10, 1995.
*463 William S. Watkins, St. Martin, Lirette, Shea & Watkins, Houma, for plaintiff/appellee.
Kenneth H. Laborde and Gina S. Montgomery, Pulaski, Gieger & Laborde, New Orleans, for defendants-appellants.
W. Richard House, Jr., House, Golden, Kingsmill & Riess, New Orleans, for defendant/appellant, McDermott Inc.
Before SCHOTT, C.J., and WARD and LANDRIEU, JJ.
SCHOTT, Chief Judge.
Plaintiff, an employee of McDermott Incorporated, was injured aboard a barge owned by McDermott. He was sitting on a small aluminum boat near the barge's helicopter pad when a helicopter owned by International Helicopter Transport, Inc. (IHT) landed on the pad and stirred up enough wind to upset the small boat injuring plaintiff. After a bench trial the court rendered judgment in favor of plaintiff for $734,005.00 and allocated 25% of the fault to McDermott and 75% to IHT. In a separate judgment the court also cast IHT for 75% of the maintenance and cure payments made by McDermott to plaintiff. IHT and McDermott have appealed challenging both the allocation of fault and quantum. McDermott answered IHT's appeal of maintenance and cure. In addition to these issues, IHT also contends that the trial court erred in allowing plaintiff to waive the jury he originally requested.
On June 19, 1988, plaintiff and several other McDermott employees were on the barge awaiting a work assignment. They were near the office which was located beneath a helicopter pad. The pad was about forty feet above the deck where the men were waiting. Earlier in the day some other personnel had placed a small aluminum boat on the deck and turned it upside down after removing the motor from the boat. As the waiting employees gathered near this boat which was now upright, plaintiff sat on it.
At this time an IHT helicopter transporting personnel to the barge was attempting to land on the helicopter pad. At first it was prevented from doing so because of a crane located near the pad. Since the helicopter had no means of communicating with the barge, it returned to a base on shore where someone from the helicopter contacted the *464 barge by telephone. The helicopter returned to the barge and, after circling around for a few minutes, landed on the pad. As it landed, the wind generated by the helicopter's rotating blades upset the small boat on which plaintiff was sitting with the result that he was injured.
In extensive oral reasons for judgment, the trial court found that McDermott was at fault for failing to secure the boat and IHT was at fault because the helicopter landed with a tail wind. The court exonerated the plaintiff because he was free to be in the area where he was waiting for his work assignment.
Before considering the arguments by McDermott and IHT that these findings are clearly wrong, we first consider a procedural argument by IHT with respect to the court's permitting plaintiff to waive the jury and opt for a bench trial. Plaintiff filed suit on May 9, 1989, and demanded a trial by jury. The case was scheduled for trial on November 9, 1992, but was continued. On December 1, plaintiff filed a supplemental petition in which he designated his suit as an admiralty and general maritime law claim pursuant to LSA-C.C.P. art. 1732(6). Pursuant to plaintiff's motion, the trial court on December 16 struck his jury demand. IHT moved to set aside the orders permitting the filing of the supplemental petition and striking the jury demand. After a contradictory hearing the court denied these motions.
IHT assigns error in the trial court's ruling allowing plaintiff to supplement his petition to designate his claim as an admiralty claim pursuant to art. 1732(6) and granting his motion to strike the jury. IHT argues that it was entitled to a contradictory hearing on the motion to file the supplemental and amending petition and it was prejudiced because the trial judge pre-judged the case on the basis of statements made by counsel at pretrial conferences when everyone was anticipating a jury trial.
The plaintiff alone has control over whether his admiralty case is to be tried to a judge or jury; he need not make this designation at the inception of the case, but he may supplement his petition in order to choose a bench trial over the jury. C.C.P. art. 1732(6); Parker v. Rowan Companies, Inc., 599 So.2d 296, 299, 300 (La.1992). With respect to the filing of the supplemental and amending petition in which plaintiff designated his suit as a maritime or admiralty claim so as to waive the jury, there was no requirement for a contradictory hearing before the amendment was filed. C.C.P. art. 1151 requires only leave of court for an amendment.
As to IHT's claim of prejudice by the judge because of the free discussion of the issues by the parties at the time they were anticipating a jury trial, the record does not support this contention because there is no transcript of these discussions. Furthermore, the other parties dispute IHT's impressions of these discussions. In any event, since plaintiff had an absolute right to designate his claim pursuant to art. 1732(6), he could not be deprived of that right because of some perceived prejudice on the part of the judge. Once plaintiff opted for a bench trial, IHT's remedy regarding the allegedly biased judge was to move to recuse her before she tried the case.
The case was not tried until five months after it was designated for a bench trial. Consequently, IHT had adequate time to adjust its trial strategy for a bench trial and to take any action it deemed appropriate including recusation of the judge. Having concluded that this procedural assignment of error by IHT is without merit, we turn to the court's allocation of fault which is disputed by IHT as well as McDermott.
The trial court's finding of fault on the part of McDermott is not clearly wrong. The record established that McDermott had a duty to secure the little boat; it breached this duty, and this breach was a cause in fact of the accident. Everyone knows that a helicopter, when landing or taking off, generates a great deal of wind on the ground so that loose objects are blown about. This was McDermott's barge, its helicopter pad, its little boat, unsecured and next to the pad, and its employees standing around. Bill Hunter, the barge superintendent, testified that the boat should not have been left unsecured on an open deck when it was not in use. Floyd Cook, an engineer employed by McDermott, had used the boat with some *465 other employees the day of the accident. When they finished with it, they removed the motor and turned the boat upside on the deck. He stated that he told the barge foreman to move the boat and the foreman said he would move it as soon as he could. When the accident happened later on, the boat was in the same place, but was upright with plaintiff sitting on it. The burden of proof on the plaintiff to establish fault against his employer in an action based on general maritime law and the Jones Act is very light. Landry v. Two R. Drilling Co., 511 F.2d 138 (5th Cir.1975). We find no error in the trial court's conclusion that plaintiff carried this burden as against McDermott.
With regard to IHT, the record readily demonstrates that the trial court's allocation of any fault to IHT was clearly wrong. In extensive oral reasons for judgment, the trial judge reduced the finding of IHT's fault to the failure of the helicopter pilot to land against the wind or across the wind instead of landing with the wind. There was much testimony that more wind on the ground, "rotar wash", is generated when the helicopter lands with the wind. While the record is not at all clear on this point, the trial court found that the pilot did land with the wind and we may accept this finding for purposes of this discussion.
McDermott produced as a witness Jesse Stonecipher, an aircraft accident investigator, who opined that the accident was due to the helicopter pilot's failure to see the small boat and the men on the deck. He further opined that the pilot's failure to avoid directing the rotor wash of the helicopter toward the boat constituted negligence. He stated that the pilot should have avoided a downwind approach and that the pilot should have seen that the boat on the deck was unsecured.
This accident did not happen because there were men on the deck below the helicopter pad. It happened because there was a loose boat on the deck. It is absurd to expect a helicopter pilot landing on a pad forty feet above the deck of a barge to see that a small boat on the deck is unsecured. The pilot's attention must be focused upon making a safe landing, not upon determining whether small objects on the deck are secured. As to Stonecipher's assertion that the pilot was negligent for failing to see people on the deck, this presupposes a duty not established in this record that a helicopter pilot may not land on a pad when people are on the deck below the pad. In any event, the trial judge's conclusion of fault on the part of the pilot was based on his downwind approach to the pad. While the record shows that more wind would be generated on the ground in a downwind approach than otherwise, it does not contain any evidence that an approach against or across the wind would have prevented the boat from being upset. In other words, the record does not offer any support whatsoever for the trial court's conclusion that the pilot's failure to make the proper directional approach was a cause of the accident.
In the final analysis, McDermott was in full charge of this operation. Its personnel, including plaintiff, were well aware that helicopters would be landing on the pad and that objects should be secured on the deck so as not to be blown around by the wind from the helicopters. The only breach of duty attributed to the pilot by the trial judge was landing in the wrong direction. If this was a dereliction at all, there is no evidence that this was the cause of the accident. Consequently, the judgment insofar as it allocates fault to IHT is to be reversed.
The remaining issue on liability is McDermott's claim of comparative negligence on the part of plaintiff. The trial court gave the following reasons for finding no negligence on the part of plaintiff:
With regard to Mr. Michael Dupre in terms of assessing his negligence, he was waiting around near the office of the derrick barge, which was located immediately under the helipad, there was nothing to suggest any negligence on his part since he was told to stand by. The supervisor for the welders was in the office, which is located immediately under the helipad. There was no requirement that the welders be in any particular area, although the boom shop for welders was located immediately under the crane These employees, *466 namely welders, were not restricted to certain areas of the barge and for that reason the Court can find no negligence on the part of Mr. Dupre.
These reasons do not address the duty plaintiff had to take care of himself. They establish that he was not under any duty to be where he was, in the position he was in, when the accident happened. On the contrary, they readily demonstrate that he voluntarily placed himself in a hazardous situation which led to the accident. Consequently, the trial court's conclusion of no negligence on the part of plaintiff for the reason given is manifestly erroneous.
The record clearly demonstrates comparative fault on plaintiff's part. He had been doing this type of work and had experience with helicopters' landing nearby for seven and one-half years. He was sitting on this loose boat with his legs dangling over the side as the helicopter approached to land. Although he testified that he thought the boat was stable and presented no danger to him, the fact is that the wind from the helicopter turned the boat up or over while he sat there. The only conclusion that can be drawn from these circumstances is that he should have known he had placed himself in a dangerous position; he had a duty to take care of himself, and he breached this duty. We have concluded that fifty percent of the fault for the accident is attributable to plaintiff.
McDermott next contends that the quantum of damages is excessive. The trial court awarded the following amounts to plaintiff:

Past physical and mental pain
and suffering, disability and impairment. $150,000.00
Future physical and mental pain
and suffering, disability and impairment 150,000.00
Past medical and pharmaceutical
expenses 58,922.00
Future medical and pharmaceutical
expenses 15,000.00
Past wage loss 75,199.00
Future wage loss 284,884.00
 ____________
 TOTAL $734,005.00

In reasons for judgment the trial judge found that plaintiff sustained injuries to his back and neck with the principal injury to his cervical spine which eventually resulted in a three level cervical fusion performed by Dr. Stewart Phillips. The court based the award for lost wages on the testimony of Dr. George Rice, an economist, and the premise that plaintiff is absolutely unemployable because of physical limitations resulting from the accident.
McDermott argues abuse of discretion by the trial court in the amount of the awards. More particularly, it contends that plaintiff failed to prove causal connection between the accident and his back problems or his neck surgery, failed to establish the necessity for the surgery, and failed to prove he was totally disabled. Thus, the challenge to the award is not that it is excessive per se, but that the factual basis for the award is not supported by the evidence. Therefore, in the exercise of appellate review, it becomes our duty to consider all of the medical and lay evidence on these questions and determine whether the findings of the trial court are clearly wrong. Ambrose v. New Orleans Police Amb. Serv., 639 So.2d 216, 220 (La.1994); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Della Dupre, plaintiff's wife of eleven and one-half years, testified that before the accident her husband was actively involved in the parenting of their daughter and participated with her in household duties as well as recreational activities such as fishing and hunting, but after the accident he complained of nerve and back pain, withdrew from all activities with her, often cried and became a loner. She accompanied him to see Dr. Donald Judice and on the very first visit on July 19, 1988, plaintiff told him he was suffering with back pain, as well as neck pain, with the neck being the worse pain of the two. By the time of the trial in May 1993, he could not walk very well because of his back, but "his neck [was] doing great."
Plaintiff testified that when the helicopter came over him as he sat in the little boat he was thrown against a handrail. His head hit the handrail and then he felt the boat hit him in the back of the head. He was taken below deck and then to a hospital by helicopter where he remained for two to three hours. He was treated by Dr. Michael Heck for a *467 short time until he began seeing Dr. Judice. On the first visit he complained about his back and neck, but Dr. Judice decided to treat the neck only. He was treated by Dr. Judice until April 1989. Asked to describe the various problems he had from the accident, plaintiff said he gets bad headaches and shoulder pain, back and right hip pain causing him to limp, and numbness in his legs. These conditions have persisted from the time of the accident. Since the neck surgery, he no longer has headaches and has only some stiffness in the neck in the morning. He broke his hand in September 1988 when he lost his temper and punched the wall. On two other occasions he also injured himself. He reported his back pain to Dr. William Kinnard in October 1988 as well as to Dr. Judice. He was suffering with neck pain constantly from June 1988 and told Dr. Phillips about it on every visit.
Dr. Michael J. Heck reported as follows: On June 20, 1988, the day after the accident, plaintiff was seen in his office. He was wearing a soft cervical collar and was complaining of neck pain radiating into the left arm. Heck diagnosed a cervical strain with radicular complaints which he treated conservatively. The following week Dr. Heck recommended an MRI because of continuing radicular complaints. Dr. Daniel H. Johnson ran the MRI on July 2 and conveyed these impressions to Dr. Heck:
1. Abnormal bilateral posterolateral projection of disc material at the C3-4 disc space may represent fairly symmetrical bilateral herniation.
2. Lesser bilateral posterolateral disc bulging at C5-6.
3. Equivocal left posterolateral projection of disc material at the C6-7 space.
Upon receiving this report, Dr. Heck recommended that plaintiff be evaluated by Dr. Judice, a neurosurgeon.
Dr. Judice examined plaintiff for the first time on July 19, 1988. He complained of neck pain, but had no complaint of back pain. Judice examined him and reviewed the MRI done for Dr. Heck. Because this was abnormal, he ordered a myelogram and a CAT scan which were performed on August 9. These revealed a small bone spur between C3 and C4, but no disc herniations or nerve compression. The bone spur was not caused by the accident of June 19, but was of long standing. Because plaintiff continued to complain of so much neck pain, he ordered a nerve conduction study which was performed on August 26 and which was negative for nerve root injury. Judice recommended physical therapy and referred him to Dr. William H. Kinnard, an orthopedist, because plaintiff was complaining of shoulder pain. Judice saw plaintiff on September 26 and October 20, 1988 and concluded that plaintiff had a cervical injury which had resolved conservatively with no herniated disc or nerve root injury. In the meantime he had referred plaintiff to another neurosurgeon, Dr. Michael Carey, for a second opinion because of plaintiff's continuing complaints, and Dr. Carey reached the same conclusion as he did.
On October 20, 1988, plaintiff complained of low back pain for the very first time. Dr. Judice had an MRI done on his lumbar spine on November 2 which revealed bulges at L3-4 and L4-5, but no nerve root compression. These were not caused by the accident, but were from natural degeneration. He continued to treat plaintiff conservatively until April 4, 1989, when he discharged him because he felt that there was nothing more he could do for him. Asked about the merits of a discogram as a diagnostic tool, he stated it was not a valid test; he did not accept its results, and he did not believe surgery was necessary for the plaintiff regardless of the results of the discogram done in 1991.
Dr. Kinnard examined plaintiff on September 1, 1988, on referral from Dr. Judice. He was primarily interested in the shoulder complaints, but he found tenderness at C3 without spasm. He examined the X-rays and myelogram ordered by Dr. Judice which showed evidence of an osteophyte or spur at C3-4 which he thought was a degenerative condition. On September 8, 1988, he reviewed the MRI done for Dr. Heck which showed evidence of disc herniation at C3-4 and possible disc protrusions at C5-6 and C6-7. On October 13, plaintiff returned wearing a neck brace. This was the first time he complained of low back pain even *468 though plaintiff told him the back pain had been present since the accident. At this visit plaintiff also gave Dr. Kinnard a copy of an emergency room record dated September 28 showing that he had fractured his finger that day when he fell at home on his hand. Because he had not mentioned his back pain until October 13, Dr. Kinnard could not relate it to the July accident. He continued to treat plaintiff until December 1988 for the shoulder problem which he diagnosed as tendonitis.
Dr. Carey, a neurosurgeon, examined plaintiff on October 6, 1988, at the request of Dr. Judice. He complained of pain in the neck and shoulders and numbness in his little finger of the left hand. He found nothing objectively wrong. He reviewed the MRI, CAT scan and myelogram and found no need for treatment for the C3-4 disc other than a collar and an orthopedic pillow. He returned on November 3 with the same complaints, but added a complaint of back pain. An examination of the neck, back, and shoulder left Carey with the impression that plaintiff had neck and shoulder pain with no neurologic basis for the pain. Because of the absence of nerve root findings, he did not consider plaintiff a candidate for surgery to the neck. He could not relate anything in his findings in October and November 1988 to the eventual surgery performed by Dr. Phillips in December 1991.
Dr. Phillips, an orthopedist, first saw plaintiff on March 14, 1989, on referral by his attorney. He was complaining of neck and back pain. The cervical examination was normal and plaintiff never complained about his neck again until July 1991, even though he was seen by Dr. Phillips on numerous occasions for treatment of his back complaints. As to the back, Dr. Phillips' initial lumbar examination on March 14, 1989 disclosed muscle spasm and loss of motion. Phillips' impression was a bad disc and he ordered an MRI, a discogram, and a facet joint block. He was never able to determine where in the back the pain was coming from so he treated plaintiff's back condition conservatively through 1989 and 1990. He noted that plaintiff was developing psychological problems during this time and was aware that plaintiff was seeing Dr. Robert Ancira, a psychiatrist. By July 12, 1990, Phillips thought plaintiff was ready for rehabilitation, but when plaintiff returned on July 20 he was complaining of so much pain and was suffering with hyperventilation that Phillips ruled out the rehabilitation. Dr. Phillips continued to treat plaintiff for his back complaints during the first few months of 1991. He was not aware of an incident in 1991 in which plaintiff hurt himself while using a sledge hammer and did not think he was capable of such work. In May 1991, he ordered a myelogram and CAT scan for the lumbar spine and found it was still normal.
In July 1991, plaintiff complained of neck pain for the first time since March 1989. This prompted Phillips to order another myelogram and CAT scan which showed a bulging disc at C3-4. In October he decided to have a discogram done on the cervical spine. This was done in November and showed that the discs at C3-4 and C4-5 were abnormal and producing pain. He consulted with Dr. Ancira, a psychiatrist, about performing surgery on plaintiff, and, on December 20, 1991, he performed a three level anterior cervical fusion on plaintiff. Plaintiff apparently made a satisfactory recovery from this neck surgery, but he was still under Phillips' treatment for his back at the time of the trial on May 13, 1993. He thought there was a causal relationship between the accident and plaintiff's back and neck problems.
Dr. Ancira testified that plaintiff was referred to him beginning February 20, 1989 by his attorney because of a lack of objective explanation for the pain he was having. He continued to treat plaintiff and predicted that he would need psychiatric medication and therapy indefinitely. He classified plaintiff's condition as a conversion disorder which is characterized by physical symptoms that are not related to a physical cause. He noted that following the surgery on his neck plaintiff experienced a tremendous amount of relief from his cervical pain and headaches, and this had a favorable effect on his psychological well-being.
Dr. Carl Culicchia, another neurosurgeon, saw plaintiff on referral by McDermott on May 4, 1989. After reviewing the file of x-rays, *469 myelogram, MRI and CAT scans, and conducting his own examination, he concluded there was a minimal structural abnormality at C3-4, a slightly bulging disc, which was unrelated to the June 19 accident because it was of a degenerative nature. There was no evidence of a neurological injury, a ruptured disc or changes in the nerve roots and spinal cord. His complaints were subjective. Surgery was not necessary and there was no need for medical or neurosurgical treatment. He thought discography was not reliable, was controversial, and was not used by most neurosurgeons. Because of the lapse of time between the accident and the surgery, he saw no causal relationship between them.
Dr. Christopher Cenac, another orthopedist, saw plaintiff on referral by McDermott on July 5, 1989. On the basis of his review of the entire file of tests and his own examination, he found no objective evidence of any structural abnormality as a result of injury in plaintiff's lumbar or cervical spine. He thought there was no need for further tests and no evidence to support a need for surgery. He could not relate the surgical procedure to the accident.
Dr. Richard Morvant, an orthopedist, testified that he treated plaintiff on October 7, 1988, for a fractured finger he sustained when he tripped and fell in late September. This visit was a follow-up to emergency room treatment he had right after the fall.
Dr. Sherry Oyler, a chiropractor, first saw plaintiff in June 1984 with complaints of pain in his right leg and groin. He told Oyler he had neck pain about six months previously. In July 1984, he told Oyler his neck was pulling and his shoulder hurting after swinging a sledge hammer. In January 1987, he came to Oyler complaining of neck pain after falling off a catwalk, and in August and October 1984 he had complained of neck pain.
In the Arceneaux case, the court specifically repudiated the practice of locating support in the record for the trial court's conclusions and ignoring the balance of the record. As reiterated in Ambrose "a proper review, therefore, cannot be completed by reading so much of a record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Ambrose at 220.
Dr. Phillips provided the following significant testimony:
Q. Since your initial treatment of Mr. Dupre, based on what diagnostic tests did you use to reach the conclusion that he needed the surgery?
A. The diagnostic test includes a physical examination, which showed muscle spasm in his neck and loss of motion, and the history of neck and arm pain. And then the MRI which showed a protruding disc, and then the discogram which showed that protruding disc was a pain generator with an irritating source where if you pressurized it you'd reproduce the pain. On the basis of that I was going to go ahead with the surgery.
Q. And did your surgical result confirm or dispute your diagnosis before that?
A. It confirmed it.
Q. In your opinion, within a reasonable degree of medical certainty, did the injury which Mr. Dupre reported to you he suffered on board the Derrick Barge 16 in June of 1988 create the condition in his cervical spine for which you operated?
A. Yes, given history that Mr. Dupre gave me I think that he did indeed injure his neck at the time of the derrick barge accident, and that was the triggering thing that caused the discomfort in his neck.
Q. Same question as to the lumbar spine, within a reasonable degree of medical certainty based on the history and your testing and treatment, did that incident also cause the symptoms and problems for which you are treating him in this lumbar spine?
A. Yes.
This testimony certainly supports the conclusions that surgery was necessary and the condition which made it necessary was caused by the accident. It also supports the conclusion that the back problem was caused by the accident.
If we were to employ the technique condemned in Arceneaux and Ambrose, we *470 could simply affirm the judgment based upon the extracts quoted above from two pages of transcript and ignore the 800 or so other pages. But our task is not that simple. In Ambrose, 639 So.2d at 220, the court quoting Arceneaux, had this to say:
A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." (Emphasis supplied)
We have complied with the Supreme Court's directions by meticulously reviewing the testimony of numerous physicians as well as the entire transcript of Phillips' testimony. Having done so, we cannot make the determination that the finding of the trial court is "not clearly wrong." In other words, we have concluded that the finding of causation by the accident of the neck condition and ultimate surgery was clearly wrong. Our explanation for this conclusion follows.
Long before the accident on June 19, 1988, plaintiff had neck problems. He complained to his chiropractor, Dr. Oyler, about his neck as early as June 1984, continued to have these complaints throughout that year, and was back again in January 1987 with neck complaints.
The MRI taken shortly after the accident showed an abnormal disc at C3. While this was thought to be a herniation by Dr. Johnson who ran the MRI and Dr. Kinnard the orthopedist, Dr. Judice who was plaintiff's treating physician for eight months and a neurosurgeon thought it was a bone spur that took years to form; it was not a herniation, and there was no nerve root compression. This interpretation was shared by two other neurosurgeons, Drs. Carey and Calicchia, and an orthopedist, Dr. Cenac.
But Dr. Judice did not ignore plaintiff's continuing complaints by any means. He had a myelogram and CAT scan done which told him again there was a bone spur of long standing at C3-4, but no other disc herniations. As plaintiff continued to complain, Dr. Judice "still wondered if it was possible that he had a nerve root injury." (Tr. pages 424-425). He ordered an EMG and nerve conduction studies. This disclosed no cervical nerve root injury. On September 26, he reached the conclusion on the basis of all these tests that plaintiff had suffered a muscular skeletal injury which had resolved conservatively. In a final effort to find a good reason for plaintiff's continuing complaints, he referred plaintiff to Dr. Carey for a second opinion which was entirely consistent with his own. The next time plaintiff came to Dr. Judice was on October 20, 1988, the visit during which he made his very first complaint of low back pain now four months after the accident.
Over the next few months, Dr. Judice's attention shifted to plaintiff's back complaints, and in January plaintiff was complaining more of shoulder pain for which he was referred to Dr. Kinnard for treatment. When Dr. Judice saw plaintiff on February 14, 1989, he was in active physical therapy and Judice told him he would soon discharge plaintiff. On his last appointment with Judice on April 4, 1989, plaintiff was complaining of pain in his neck, back, left leg and left arm, but Judice could find "no evidence of objective injury." (Tr. p. 432).
At this point in time plaintiff had begun to see Dr. Stuart Phillips whom he had gone to on March 14, 1989. Phillips described this as an examination for "a 4th or 5th opinion because.... no one has been able to make a specific diagnosis." (Tr. p. 138). Phillips said his cervical examination was "basically normal", but the lumbar examination was abnormal. The most astounding aspect of the testimony of Dr. Phillips is his finding of a normal cervical spine at this time and no further complaints by plaintiff of neck pain until July 1991 which was twenty-eight months later.
On direct examination Dr. Phillips stated that in January 1991 plaintiff was complaining of shoulder pain, arm pain and neck pain, but he stated on cross examination that there was no entry in his record of the January 15, 1991 visit of neck complaints. When pressed about the absence of any reference to the neck during this twenty-eight month period, he explained, "There were generalized complaints, but nothing that I specifically noted *471 about the neck." No matter what spin is put on this testimony, the only fair interpretation is that Dr. Judice was right when he discharged plaintiff; the aggravation of plaintiff's old pre-accident neck condition had been cured and the neck was no longer a problem until it suddenly returned in July 1991, now over three years after the accident and after being dormant for at least twenty-eight months. It would strain the credulity of any reasonable fact finder to find causation for plaintiff's sudden return of a neck problem by the accident of so long ago.
Except for the isolated opinion of Dr. Phillips quoted above on causation, there is no explanation by him or any one else how this could be. Asked whether the neck condition in July 1991 could have been caused by something other than the June 1988 accident Dr. Phillips said, "Anything is possible." Asked about the significance of plaintiff's trips to the chiropractor for his neck in 1987, he simply denied any knowledge of what the chiropractor found. Further pressed, Dr. Phillips stated that plaintiff had a history of intermittent headaches and several occasions of neck pain during this long period of time, even though his records did not reflect this. (Tr. p. 181).
When plaintiff again began complaining about his neck, Dr. Phillips focused his attention on this problem. None of the many tests he ran confirmed the need for surgery until the discogram was done. Phillips' attitude about the discogram and the surgery was pragmatic. The surgery confirmed the disc so the discogram worked; plaintiff was free of pain after the surgery, so it worked. Notwithstanding Phillips' opinion, based upon the testimony of the neurosurgeons the evidence is clear that a discogram is a controversial and questionable procedure because it relies upon the subjective reaction of a patient to pressure applied to the spine in order to determine whether pain is produced.
Furthermore, even in retrospect, neither of the neurosurgeons nor Dr. Cenac thought the surgery was necessary for the condition they saw in plaintiff's neck all the way until July 1989, and not one physician in the case other than Dr. Phillips would causally relate the neck condition and surgery in late 1991 to the accident.
One final point on this issue is significant. Plaintiff testified that he told Dr. Phillips his neck was hurting throughout the period he was seeing him and could not explain why it wasn't recorded. He likewise insisted that he told Drs. Judice and Kinnard about his back pain on his first visits with them, but could not explain why they didn't record it.
Based upon the foregoing, we have concluded that the finding of the trial court that plaintiff's surgery was the result of the accident is clearly wrong and this error led to an abuse of the trial court's discretion in the award of damages. Although a portion of the award may have been attributable to back pain and other injuries, it is clear from the trial judge's reasons that the award of general damages was primarily for the neck. Consequently, a substantial reduction of the $300,000 general damages award is warranted.
Having dealt with plaintiff's neck problems, we must now consider his back problems. McDermott raised the issue of the award of $284,884 in future lost income which the trial court based upon the testimony of Dr. Rice. This testimony is likewise manifestly erroneous because there is no evidence in record to support it. Dr. Rice is an economist, not a physician. He hypothesized that plaintiff was totally disabled and unemployable, and he generated the future lost income figure taken by the trial judge on the supposition that plaintiff would never be able to earn a penny.
The medical testimony does not support this. Dr. Phillips did not quantify plaintiff's disability and did not characterize plaintiff's back problems as totally disabling. Once plaintiff started with his neck problem in July 1991, the back was virtually forgotten. In the meantime, none of the other physicians testified that he was disabled. Plaintiff produced a vocational rehabilitation specialist, Glen Hebert, who ruled out any type of intellectual work or paperwork because plaintiff is a functional illiterate, but he thought plaintiff could perform some light to medium physical work. He stated that the skills plaintiff has require physical work which he *472 cannot do based upon the depositions and reports about plaintiff. Of course, this calls into question the entire testimony of this witness because the record does not show just what medical or disability problems he attributed to the back or neck or both. In any event, this witness based his opinion of plaintiff's unemployability on the premise that he didn't think anybody would hire him. However, he did not actually look for employment for plaintiff.
On the other hand, another vocational rehabilitation counselor, Larry Stokes, had a different view. When he saw plaintiff in March 1992, Dr. Phillips indicated some physical restrictions including no lifting over 50 pounds at one time or 25 pounds repetitively, no looking up and back, no working with arms overhead, no bending or stooping repetitively. Stokes performed a labor market survey and found that jobs were available to someone like plaintiff and these come open from time to time. In these jobs such as security guard, pizza delivery person, or video rental clerk, he can earn a minimum of $5 per hour.
Stokes saw plaintiff in March 1992 and had the benefit of Dr. Phillips' opinion allowing some work. Plaintiff's witness, Glen Hebert, saw plaintiff in October 1991 when he was at the height of his neck problem. In fact this visit was sandwiched between cervical facet blocks and discography done at Phillips' request on September 25 and October 23, 1991. All of the plaintiff's witnesses, including himself, his wife, and Dr. Phillips, said he was much better off after the surgery in December. Consequently, Stokes' opinion is far more helpful and reliable than Hebert's.
Returning to the opinion of Dr. Rice which the trial judge accepted, it is seriously flawed for these reasons: 1) It presupposes that all of plaintiff's problems, including the neck, were caused by the accident; 2) It rests on no medical testimony, but on that of Glen Hebert whose opinion was also fatally flawed; 3) It presupposes that plaintiff cannot earn anything for the rest of his life. Rice testified that plaintiff's loss of future earnings, if he can earn $5 per hour, would be $100,061 instead of $284,884. The conclusion that he cannot earn $5 per hour is manifestly erroneous.
The last question which must be addressed is whether plaintiff is entitled to compensation for his back problem. From the trial court's reasons we do not believe a significant amount was included for the back. We know from the record that plaintiff did not complain to Dr. Judice, his treating physician, about his back until four months after the accident. Dr. Morvant testified that plaintiff told him that he fell down at home shortly before he made this complaint. Dr. Judice was asked how likely is it for a person to experience both neck and back pains from the same accident and he responded that after a very active practice in neurosurgery for thirteen years he's seen it only twice, so the likelihood is very slight. (Tr. p. 429).
Returning to the general damage award, plaintiff is entitled to damages for pain and suffering resulting from the aggravation of a pre-existing degenerative condition in his cervical spine which for the most part had resolved in March 1989, a total of nine months. Since the trial judge included some amount in her award for back pain, we would include something for the minimal amount of back pain that can be attributed to this accident. We would also include in the award some damages for psychological injury based upon the testimony of Dr. Ancira. We conclude that an award of $75,000 would adequately compensate plaintiff for the general damages resulting from the accident.
As to lost wages, the trial court's awards are based upon findings that plaintiff is totally and permanently disabled and the accident caused this disability. For the reasons stated herein, these findings are clearly wrong. Considering that he did sustain some injuries which initially prevented him from being employed and which may detract from future employment potential and that he is left with a psychological problem, we reduce the awards for past and future wage losses to $25,000.
We do not award any amount for medical expenses since McDermott as plaintiff's employer paid the past expenses and is obliged to continue to provide him with medical care required by this accident.
*473 Accordingly, that portion of the judgment in plaintiff's favor and against International Helicopter Transport, Inc. is reversed and set aside and plaintiff's suit against this defendant is dismissed; that part of the judgment in plaintiff's favor and against McDermott Incorporated is amended to allocate fifty percent of the fault each to plaintiff and McDermott; the judgment on the main demand is otherwise affirmed, but is amended to be in favor of plaintiff and against McDermott for a total of $50,000 plus interest and costs. All cross claims are dismissed.
REVERSED IN PART, AMENDED IN PART, RENDERED.