hWALTZER, Judge,
dissenting with reasons.
While I agree with the majority that there is substantial evidence of record supporting a finding for the defendants, I am persuaded that under this state’s manifest error standard, the jury’s verdict should be affirmed. Therefore, I respectfully dissent.
Ms. Gooden testified:
Q: Where did you park?
A: I think that was by Fifth Avenue where I parked, Sax Fifth Avenue where I parked the car.... As I said, it was barricaded all around so I had to go— where I parked the car I had to go around and then go down the steps to get into the part that I wanted to get to. I went to deliver some lunches to my niece and some of the workers.... She worked on the 12th floor, 1290.... As I was going to deliver the lunches, on my way down right where I stepped down and went on, I landed on the ground and that’s where I stayed.
She testified that she fell “on the front part going down the steps to Canal Place.”
Not in the direct building where I wanted to go.... I just went down.... When I got out the ear I took — getting out the car I took one bag and put it in my hand and I rested and got the other bag and put it in my hand and I was just walking on, and when I got down doing down the steps, I took the two bags and was holding them in one hand.
The defense attempted to show that plaintiff was carrying a box full of lunches; however, plaintiff testified that she was carrying the lunches in two plastic grocery bags in one hand:
Q: Was it plastic with handles like this? 1¾A: Yes.
Q: Were those lunches very heavy to carry?
A: No.
She describes how she was holding the bag:
Q: In the right hand?
A: Yes. When you got something in the plate, they fit level in the bag and the bags that I have was a little bigger than those bags and I was holding them like this (indicating) by the handle going about my business.
Q: Where were you looking when you were walking down?
A: Straight ahead.... As I was going down, right where I was going down that’s where I landed.... My left foot slipped and I landed down right where I slipped. I went down and this here was buckled under my other leg....
On cross-examination, she responded as follows:
Q: Isn’t it true that when your foot slipped you were on the second step from the top of the steps?
A: If I was there, I went down, and right where I went down, that’s where I come from.
Q: Do you recall ... how many total steps there were that you were going down?
A: I think it was about five steps. I got to the — I got off the top. I was on the next step and I went to step to the next one and that was it right where I went. That’s when I went to go to the next one, I landed down on my butt....
Q: ... So the second step is where your left foot' slipped; is that correct?
*956 A: Yes. Right where I was going down, that’s where I went and landed.
Q: Did you land — my question is — on the steps or on the bottom area of the plaza? A: On the bottom, the very bottom.
Q: So, when you fell, you didn’t actually fall on to the step, you fell at the bottom of the steps?
A: On the bottom.
... Q: So if you slipped on the second step, you would have fallen down maybe three more steps if there were five steps total, would that be fair maybe?
A: Yes. But you know I had come down the steps.
Ms. Gooden testified she looked down at the first step as she started to descend the steps. When continued questioning to ascertain whether she was | booking down at the steps as she descended brought the repeated response, “I was looking straight ahead,” and she refused to answer yes or no, she was asked:
Q: When you looked down at the first step, did you see anything on the step?
A: No, I didn’t see anything on the step.
Q: Did you at any point see anything on the steps after your accident?
A: I was going down the steps. I’m sitting on the ground, and when the guards and the people that was around me trying to calm me down, that’s when I glanced over. I was sitting facing the steps then and I seen some little green things off the [Christmas] tree.
Q: Little needles?
A: Yes. It looked like needles on the step.... The second step, the second, third step.
Q: Don’t guess. We are trying to get the facts.
A: The second step had the little green needles that comes off the tree.... I didn’t count. All I know it was trash_ little pines and things on the ground up there on the step.
Q: Isn’t it true when you gave your deposition -you said there was also some tinsel on the steps? ...
A: I know they had something like that on there but I know them little green things.
Q: But you don’t know if that’s what caused you to fall?
A: I don’t know what caused me to fall. All I know I went down.
Q: Did you ever tell anyone that cracks in the pavement caused you to fall?
A: No.
On re-direct examination by plaintiffs counsel, she testified:
Q: So you fell directly over the area where you slipped?
A: Yes.
The EMS driver, Mr. Johnson, testified that there was a cracked brick or slate at the bottom of the steps in the courtyard, which he described as a spider-web radiating. Plaintiffs counsel repeatedly phrased his questions referring to the crack on the STEP, but Johnson testified that the spiderweb cracking was on the floor of the courtyard, not on the steps. The cracked brick was immediately under Ms. Gooden as she sat on the floor of the courtyard:
UQ: Where was Mrs. Gooden positioned relative to this cracked area?
A: Mrs. Gooden was in the courtyard area, kind of as I recall maybe sitting right in the courtyard and the break was basically in front of her or to the side of her.
Q: But you are certain that this cracked area you saw was at the bottom of the steps, not at the top of the steps?
A: Right.
Q: Isn’t it also true that the area of the cracks that you saw were even though it was cracked it was level, it wasn’t raised pieces of slate or brick or whatever the material was but it was a level area, as you call it a spider web type crack in it?
A: Correct.
Q: Did you observe any king of Christmas tree needles or any kind of Christmas decorations on the steps in the area where Mrs. Gooden had fallen?
A: I don’t recall anything.
*957 Q: Did Mrs. Gooden tell you anything about Christmas tree tinsel or needles on the steps?
A: Not as I recall.
Ms. Gooden testified that she gave Johnson information about the heart medication she was taking, but she denied that she told Johnson anything about how the accident happened, although his report says: “Patient stated she misjudged bottom step which caused her to fall.” Ms. Gooden also signed the report, and identified her signature during the course of her cross-examination.
The emergency room nurse, Kathleen Thompson, testified, and identified the emergency room record for Ms. Gooden. Thompson had taken the history when Ms. Gooden arrived, and testified that she spoke to Ms. Gooden herself (which Ms. Gooden had denied during her testimony.)
Q: Did you make any record of what the patient told you about the accident?
A: Yes, sir.
Q: Could you tell the jury what Mrs. Gooden told you as far as what happened.
A: I have written: States at Canal Place was walking down steps, missed step and fell down two steps.
Q: ... was it customary for you to write exact words that the patient told you?
A: Exactly. We quote the patient_ “States” means she stated to me how the incident happened.... She was able to 15[communicate] because I said “states.” ... I wrote no LOC. That means no loss of consciousness.
On cross-examination, she testified:
Q: At no tone did you ask any follow-up questions of Mrs. Gooden as to what caused you to fall or what caused you to slip?
A: She told me she was walking down the steps and she missed a step. She told me how she fell. She missed a step.
Q: And you just left it right there?
A: Yes, I did.
Q: You don’t know anything about the condition of the area where Mrs. Gooden slipped and fell, do you?
A: No sir, I don’t.
While to this Court’s view the weight of the evidence might well support the premise that Ms. Gooden misstepped on the second or third step from the top and landed to the courtyard where the spider-web crack was, we are not the trier of fact. The record is not so overwhelming, that we must conclude the jury was manifestly erroneous/clearly wrong in accepting Ms. Gooden’s testimony. The plaintiffs testimony is somewhat contradictory concerning where she fell, since she said she fell on the second step and also that she fell where she landed. Particularly on cross-examination, her testimony doesn’t seem to be very direct. However, the jury probably took into account that she was not articulate and was distrustful of the circumstances of the trial in evaluating her testimony. The jury evidently chose to disregard the testimony of the two disinterested witnesses, both of whom testified they had nothing to gain or lose in the trial, but the case law is clear that a jury is entitled to make its own credibility choices.
My review of the record to its entirety convinces me that the jury’s findings are reasonable in light of that record. I am mindful of the standard of review of the verdict of a properly instructed jury:
I f,Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.... [Ajppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations to demeanor and tone of voice that bear so heavily on the listener’s understanding and belief to what is said.... [Where] a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
*958 Intermediate appellate courts are instructed that before a fact-finder’s verdict may be reversed, review of the record must show that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La. 4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although according deference to the factfinder, I am cognizant of this Court’s constitutional duty to review facts [1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La. 2/20/95), 650 So.2d 742, 745.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest |7error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
Based on the manifest error standard enunciated in the foregoing jurisprudence, recognizing the jury’s prerogative to make reasonable credibility choices, and mindful of the allocation of responsibility between the trial and appellate courts, I would affirm the judgment of the trial court.

. See, LSA-Const. Art. 5, section 10(B).