J^DUFRESNE, Judge.
This is an appeal from a judgment for damages sustained in a truck-automobile collision. Carl Miller, plaintiff-appellant, was traveling in a small car in the right lane of a three-lane expressway bridge when a tractor-trailer truck on his left, driven by Raymond Ricard, defendant-appellant, began to change lanes. The right front bumper of the truck struck the left rear fender of the car causing it to rotate counter-clockwise into the path of the truck, where it was again struck broadside. The car continued to spin until it hit the left guard rail of the bridge where it came to a stop. Eventually, Miller underwent two surgeries for back injuries sustained in the accident. After a bench trial, judgment was entered against Ricard, Truckers Express, Inc., and Planet Insurance Company, for $473,801.38 in favor of plaintiff, and an additional $50,000.00 in favor of his wife for loss of consortium. For the following reasons we amend the judgment to reduce the future medical award of $25,000.00 to $8,000.00, to reduce the past medical award by $130.00, and to reduce the loss of 12Consortium award of $50,000.00 to $25,-000.00. In all other respects the judgment is affirmed.
The particulars of the accident are as follows. During his lunch break, Miller drove up the feeder ramp and onto the elevated expressway just before the Harvey Canal bridge. He merged into the right lane of the roadway and proceeded straight ahead up the bridge. As he went over the crest of the bridge he felt an impact on his rear left fender, where an eighteen wheel truck changing lanes had apparently clipped the rear of his car. The car spun counter-clockwise into the path of the truck where it was broadsided. Miller testified that it was only at that time that he first saw the front of the truck and realized what had happened. The car was pushed along until the truck slowed, at which point it shot across the highway, struck the center guard barrier going forward, spun off and struck the barrier again going backward, and finally came to a stop.
Ricard, the driver of the truck, testified that he needed to get into the right lane, but was being overtaken on the right by a panel *198 type truck. Once the truck passed him, he put on his turn signal and began to change lanes. At that point, he felt the impact, but said that he didn’t know immediately what had happened because the car was in the “blind” spot over his hood. The investigating officer could not recall the incident directly, but noted from his report that he must have ascertained from debris at the scene, as well as statements by Miller and Ricard, that Rieard improperly changed lanes, because he issued the truck driver a citation for that infraction. The accident occurred onJjMay 17, 1993.
Miller declined medical treatment at the scene, but drove to the hospital because of knee bruises and a dislocated finger. He was released after treatment and went home. The next day he awoke feeling “stiff everywhere” and three days later reported numbness in his back with tingling and severe pain in his hips, radiating into both legs. Because of continuing pain, he went to Dr. Rudolf Hamsa, an orthopedic surgeon, on May 26, 1993. This doctor reached a preliminary diagnosis of a ruptured disc at the L5-S1 level, and this was borne out by a subsequent MRI test which showed the disc putting pressure on the nerve roots, thus causing pain. He began Miller on a regimen of conservative treatments with anti-inflammatory medications, and continued this for several months, all the while discussing the possibility of surgery if the pain persisted. By November, Miller decided to have the surgery because the pain was, indeed, persisting and perhaps getting worse. During this period, he worked at his job as a repair supervisor for Leson .Chevrolet, and continued to do so until February, 1994, the month before the surgery was done.
Dr. Hamsa performed a percutaneous dis-cectomy on March 8, 1994. His description of the procedure was that a probe is inserted through the skin of the back and into the disc area. Using a TV monitor to observe the work, the disc is cut into pieces and then suctioned out, thus relieving the pressure on the nerve roots and consequently easing the pain. Typically the procedure involves only a|4one day hospital stay, and in this case the surgery was done on one day and Miller was discharged the following morning. At first, the procedure appeared to be a success and plaintiff returned to work in April.
Unfortunately, after a few months the pain ■ was continuing and in May, 1994, Miller sought a second opinion from Dr. Bruce Raz-za, also an orthopedic surgeon. After various tests, Dr. Razza recommended further surgery, which was performed on July 15, 1994. On this instance, the remaining portions of the disc were removed and bone fragments were inserted in the resulting space. Screws were also inserted to hold the spine in place while the bone grafts calcified. The doctor explained that the end result would hopefully be a solidification of the whole bone mass at the site of the grafts which would prevent movement, and also relieve any pressure on the nerve roots.
By August, this doctor reported excellent improvement, with no further pains radiating into the legs. On an October visit, he noted total relief from leg pains, but with a little discomfort in the back which he related to standing for too long. In January, 1995, there was no leg pain and a significant improvement in the residual back pain. Visits of February and April showed that the procedure had been successful up to that point and the doctor expected continued improvement. He noted, nonetheless, that there had been a flare up of mild discomfort in the left leg which he attributed to manipulation of this leg by yet another consultant during a leg raising test. His prognosis was that |5within several months Miller would reach maximum cure, but would be left with a 15% whole body impairment, and would have to avoid repetitive bending, stooping climbing and other similar- physically stressful activities. He did not think it more probable than not that Miller would need further surgery, but declined to completely rule out that possibility. (Dr. Hamsa was also asked about the need for future medical treatments, but deferred any opinion on that question to Dr. Razza.) It was Dr. Razza’s further opinion that plaintiff could not return to either of his previous jobs as an automobile repair supervisor, or car salesman because of the walking and standing involved.
*199 Plaintiff testified about the above medical course substantially as it was presented by the doctors. He also elaborated on the continuing pain that he was experiencing, as well as describing the effect the entire incident has had on his life. He reported that his family life has been disrupted in that he is unable to assist his wife with their two young sons or play with them, can not do household chores, and can no longer participate in social events with his wife, family and Mends. He also testified that his loss of income forced him to move in with in-laws for a time and accept food stamps. His emotional and sexual relationship with his wife has deteriorated, and he has become irritable and depressed by the entire situation.
Miller’s wife testified that she has been forced to deal with the children basically alone and that plaintiff is often short with them and yells at them from time to time. She also said her relationship with her husband has become strained in that he is difficult to talk to and is | (¡often short tempered and argumentative. She also noted that he does not sleep well and tosses and turns all night, keeping her awake as well.
There was also testimony from Dr. Cornel-ieus Gorman, a vocational rehabilitation' counselor and evaluator, that plaintiff could probably expect only to be employable at a minimum wage job because of his limitations. He also said that he had, and would continue to, advise him about finding employment in spite of his restrictions. He finally noted that although Miller wanted to return to work, he suffered from depression over his entire health and financial .situation. Dr. Leighton Stamps, a rehabilitation psychologist and vocational rehabilitation counselor, did some psychological testing on plaintiff and noted that he suffered from anxiety and depression because of his situation. He noted particularly that plaintiffs inability to support his family was a major factor in his depression. He also recommended that when the physical problems had been resolved plaintiff undergo a year and a half to two years of counseling, which would costs between four and six thousand dollars.
Based on the above evidence, the trial judge found the defendants 100% liable for plaintiffs injuries and awarded the following amounts in damages:
Pain and suffering $300,000.00
Past Medicals 60,453.48
Future Medicals 25,000.00
Past Lost Wages 21,976.90
Future Lost Wages 66,371.00
Loss of Consortium (Mrs. Miller) 50,000.00
IrThe defendants have now appealed, basically contesting the apportionment of fault and the amount of various items of damages. The plaintiff has answered the appeal seeking an increase in the award for loss of future earning capacity, and penalties for frivolous appeal.
The defendants have alleged several errors which relate to factual determinations made by the trier of fact. The standard of review by an appellate court of facts found in a trial court is whether those findings are manifestly erroneous or clearly wrong, considering the entire record, Ambrose v. New Orleans Police Dept. Ambulance Ser., 93-C-3099, 93-C-3110, 93-C-3112 (La.7/5/94), 639 So.2d 216. The inquiry is thus not whether we would have found different facts or drawn different inferences had we been sitting as the original fact-finders, but rather whether the facts and inferences found in the trial court are reasonably supported by the evidence presented, Id.
In the present matter, the defendants urge as error the finding that Ricard, the truck driver, was totally at fault in causing the accident. They assert, first, that there was insufficient proof to show that more probably than not Ricard actually encroached on the lane in which Miller was traveling. Alternatively, they argue that Miller was at least partially at fault in not noticing the truck’s turn indicators and avoiding the collision. Neither assertion is sustained by the evidence. As to the negligence of Ricard, the evidence did indeed establish that he more probably than not improperly moved into Miller’s lane. Although Miller did not actually see the initial impact on his left rear fender, his testimony was clear that he went up the ramp, merged into |gthe right lane, and then proceeded straight over the bridge in that lane. Ricard said that he saw a panel type truck on his right, and allowed it to pass before beginning the lane change. He also *200 said that he did not see Miller’s small car on his right, and surmised that the vehicle must have been in the “blind” spot over the hood of the cab. The investigating officer stated that he did not remember the incident, except as it appeared in his report. He noted, however, that he gave Ricard the traffic citation and would typically only issue a citation after checking for collision debris and interviewing witnesses. Finally, there was absolutely no evidence to even suggest that Miller may have moved into Ricard’s lane, thus causing the collision himself. It is clear that the trier of fact had ample evidence to conclude that Ricard moved into Miller’s lane and caused the accident. As for any comparative fault on Miller’s part, we see no basis for this assertion. Miller was simply traveling in his lane and was almost past the truck at the moment of impact. Even assuming that he had seen Ricard’s turn indicator lights come on, there was nothing he could or should have done at that point, other than to continue in his lane. We thus affirm the finding that Ricard’s negligence was the sole cause of the accident.
Defendants also contend that the trier of fact erred in not finding that Miller had failed to mitigate his damages by not undergoing surgery sooner. Again, we see no error in the trial court’s finding. Dr. Hamsa testified at length about the process leading up to the first surgery of March, 1994. During that whole time the doctor discussed | pthe procedure with the patient, but continued with conservative treatments nonetheless. Plaintiff was still able to work, albeit in pain, and could reasonably have hoped that conservative care would eventually resolve the problem. However, by November it began to appear that surgery would be needed, and the first procedure was done in March, 1994. There is nothing in the evidence bearing on this point to suggest either that Miller unreasonably delayed the surgery, or that the delay worsened the chances for a successful outcome. In these circumstances, the trier of fact did not err in rejecting this defense.
The defendants do, however, -raise two other factual questions about past and future medical expenses awarded by the trial judge which we deem partially meritorious. They contend first that the award of $25,-000.00 for future medical expenses is .not based on any evidence of record. As noted above, Dr. Hamsa deferred any opinion on future medicals to Dr. Razza. Dr. Razza, for his part, stated:
There’s nothing in his post-op course that would make me say more likely than not he’s going to require additional fusion work or additional surgery.
He also noted, however, that some future . testing might be required to ascertain the density of the fusion mass and to determine if any movement was taking place, but gave no estimates of what the costs of such tests might be. In this circumstance, the rule is that a court should look to other evidence of the costs of similar past medical treatments to arrive at a reasonable amount for the future treatments, Stiles v. K Mart Corp., 597 So.2d 1012 (La.1992). In this case, | iq$2,000.00 is a reasonable amount for the future tests. In addition, Dr. Stamps indicated that up to $6,000.00 of psychological counseling would be needed to overcome plaintiffs depression. Thus, while there was insufficient evidence to support an award for future medicals of $25,000.00, there was evidence to support an award for this element of damages of $8,000.00, and we so amend that award.
Defendants also urge that the award for past medicals was excessive in that it included fees for expert witness who had not rendered any actual treatments on plaintiff. This item of damages totaled over $60,-000.00, but only some $8,000.00 of this amount is contested. Of this amount, there was a $1,400.00 discrepancy in a preliminary bill from Dr. Hamsa and his final bill, and we find no error in the trial judge using the final figure. Similarly, a small discrepancy in Dr. Razza’s bill was properly resolved in plaintiffs favor. Defendants especially complain about the $1,100.00 plus bill of Dr. Stamps and the $4,160.00 bill of Dr. Gorman, on the grounds that these witnesses did not render medical treatments. While it may have been technically improper to include these bills under the category of medical expenses, the amounts were nonetheless found to be owing by the trial judge because they did represent *201 payment for services rendered to plaintiff which were made necessary by the accident and consequent employment problems. We thus affirm those items. Similarly, the past medicals included $1,200.00 for plaintiffs economist, Dr. Melville Wolfson. Again, while this item was clearly not a medical expense, it is nonetheless recoverable as an element of costs. We finally note Inthat plaintiff admits that a $130.00 bill from Dr. Weiner was for treatments not related to the accident and therefore that the award should be reduced by that amount, and we so rule.
The final two issues raised by the defendants concern the general damage and loss of consortium awards, both of which they assert are excessive. Article 1999, of our Civil Code provides that:
When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages.
When appellate courts are called upon to review damage awards, the inquiry is thus not whether the reviewing court would have fixed a different amount had it been sitting as the original court, but rather whether the original court abused its “much discretion” in assessing the damages, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Further, in considering whether an award is excessive or insufficient, the reviewing court must consider the particular facts of plaintiffs injury as well as the effects of that injury on that particular plaintiff, Id. If the appellate court determines, for articulable reasons, that reasonable triers of fact could not have awarded so much or so little, then it may adjust the award downward to the highest amount reasonable, or upward to the lowest amount reasonable, whichever the case may be. Also, it is only after the court has determined that the award is unreasonable that it may turn to other cases involving similar injuries to similar plaintiffs for guidance as to what a proper award might be, Id.
In the present matter, we deem the general damages award of | i2$300,000.00 well beyond what we would have awarded on the facts of the case, but we nonetheless can not articulate reasons why the award is so high as to constitute an abuse of the trial court’s discretion. As the above summary of plaintiffs injuries shows, he suffered pain from a few days after the accident until he was forced to quit working and undergo surgery some ten months later. That procedure was a failure and he continued in pain until a second surgery during which screws were placed in his spine to keep it stable. His financial situation deteriorated to the point that he had to move in with his in-laws and was reduced to relying on food stamps to feed his wife and two small boys. He also suffered from depression because of both the pain and the financial reversals. At trial he was still in pain, although his treating physicians indicated that the problem would probably be resolved over time. Considering all of these factors, we are unable to say that the award is unreasonable, or an abuse of the trial court’s “much discretion” and we therefore affirm that award.
On the other hand, we do find the award of $50,000.00 to plaintiffs wife unreasonable on the facts presented. Mrs. Miller testified that her husband was unable to help with household chores or care for the children, and that he was irritable and uncommunicative. She also noted that their social and sexual life had been disrupted, and recounted the economic hardships that her husband’s injury had occasioned. However, there was also evidence that the husband had not done any substantial amount of housework before the accident, and as to caring for the children, the wife had quit her job some two |i3months before the accident to stay home with them. Although she reported embarrassment in having to shop with food stamps, and recounted the cramped living conditions with her parents, there was no evidenced to suggest that these latter problems were more than inconveniences. The most serious loss appearing in the record is the deterioration of the parties social and sexual lives; but because the medical prognosis is that Miller will substantially recover, these difficulties will in all probability abate. Considering the totality of the above circumstances, it is this court’s opinion that the award of $50,000.00 for loss of consortium constitutes an abuse of the trial court’s much discretion.
*202 Having found that the award was excessive, our next task is to determine the highest award reasonable on the particular facts of this case, but having reference to awards in other similar cases. In American Motorist Insurance Co. v. American RentAll, Inc., 579 So.2d 429 (La.1991), the wife suffered two ruptured cervical discs requiring surgery, and she subsequently developed a personality disorder marked by depression. The husband had to take over the household duties and look after their child. The couple no longer enjoyed an active social and recreational life, and their marital life had suffered because of the wife’s pain and depression. The trial court awarded $55,000.00 for loss of consortium, but the appellate court reduced it to $10,000.00. The supreme court agreed with the appellate court that the original award was excessive, but found that the highest reasonable award was $25,000.00. On the very similar |14facts before us here, we find that $25,000.00 is the highest reasonable amount that could have been awarded, and we therefore reduce the award to that amount.
The final issue concerns the award of $66,371.00 for future lost wages, which plaintiff claims is insufficient. This figure was taken from the report of defendants’ economic expert, Dr. J. Stuart Wood. Of course, plaintiffs expert, Dr. Melville Z. Wolfson, gave higher figures, but the trier of fact apparently found Dr. Wood’s numbers more persuasive. Because there was competent expert opinion to support either figure, we can not say that it was manifest error to accept one over the other. We therefore affirm the award for future lost wages.
Plaintiff also seeks penalties for frivolous appeal pursuant to La. Code Civ.Pro., Art. 2164. Because defendants’ have prevailed in part in this court, it can hardly be said that their appeal was frivolous, and we therefore must reject plaintiffs assertion to the contrary.
For the foregoing reasons we reduce the award for past medical treatments by $130.00, reduce the award for future medicals to $8,000.00, and reduce the award for loss of consortium to $25,000.00. In all other respects the judgment is affirmed.

AMENDED AND AFFIRMED AS AMENDED.