| ¶ Chief Judge WILLIAM H. BYRNES III.
The defendant-appellant, East Jefferson General Hospital (“East Jefferson”), appeals a judgment rendered on March 25, 2002, in favor of the plaintiff-appellee, Mary Hobson, condemning East Jefferson to pay Ms. Hobson temporary total worker’s compensation benefits from September 8, 1999 to the present and continuing until she is released by her treating physician to return to work. Appellant also appeals that portion of the judgment awarding the claimant penalties and attorneys fees.
At the outset, we wish to emphasize that claimant has benefited greatly in this decision from the deference due by this Court to the findings of the workers compensation judge, as this is a very close case. Because of the close nature of this case, we have hereinafter analyzed the record at great length in order to demonstrate clearly that we have made our decision based on a review of the record as a whole and not just those portions of the record supporting the result we reached. See Ambrose v. New Orleans Police Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216.
East Jefferson disputes neither the occurrence of the accident, nor the fact that it occurred in the course and scope of her employment with East Jefferson. | g This case revolves around the extent and causes of claimant’s injuries along with the reasonableness of East Jefferson’s efforts to accommodate those injuries in the workplace and the reasonableness of East Jefferson’s decision to discontinue the payment of benefits.
Plaintiff alleges that on June 8, 1999, she received soft tissue injuries in an auto accident causing her to experience pain in her neck and lower back. She sought conservative treatment from Dr. Michael Haydel at Premier Medical Rehabilitation. Not long thereafter, on July 26, 1999, plaintiff was involved in another auto accident resulting in similar complaints for which she again sought relief from Dr. Haydel. During this period of time, plaintiff did not miss a single day of work. Nor did she ask for any modification of her job requirements or complain of any discomfort during this period of time. She scheduled her physical treatments at Dr. Hay-del’s office so that they did not interfere with her work schedule at East Jefferson. *152 East Jefferson does not dispute these facts as alleged by the plaintiff.
Plaintiff slipped and fell flat on the floor in a puddle of water on September 8, 1999, while in the course and scope of her employment, resulting in the injuries giving rise to this litigation. She testified that her lower back was in extreme pain and she was unable to lift her legs. Pain was radiating from her legs to her toes. Her pain was qualitatively and quantitatively much more intense than that she experienced as a result of the automobile accidents. With the assistance of her fellow employees she was treated at the emergency room at East Jefferson. Immediately thereafter, on September 10, 1999, appellant was placed on temporary total disability.
| ¡¡Claimant testified as follows concerning the June 8,1999 car accident:
A. ... I was involved in a car accident. I was hit in the rear area. At the time, I went to Ochsner Hospital. I was having neck and shoulder area pains. From there, I was seen by a Dr. Michael Haydel on North Causeway Boulevard.
Q. And what type — when you went to Dr. Haydel for that June 8th, '99 accident, what type of pain were you experiencing when you eventually went and saw him?
A. I was experiencing pain in my neck area, stiffness, and my shoulder area.
Q. How did your lower back feel at that time?
A. It was just some stiffness, but nothing really major down in the lower back, just the upper part of my body.
Q. Could you describe, if any, any pain in your legs?
A. None at all.
Claimant testified that on July 26, 1999, her car was again struck in the rear as a result of which she reported the following pains to Dr. Haydel:
A. Mostly, just like I said, the upper part of my body, my neck area stiffness, just like — and, basically, like I said, the upper part of my body.
Q. And, let’s focus on your lower back. How did your lower back feel after that second accident in July of '99?
A. I had stiffness, but it wasn’t nothing major with the lower part of my back.
Q. Your legs, if any, could you describe any type of pain you were feeling in your legs?
A. I didn’t have, really any pains in my legs.
Claimant continued to do physical therapy and to take, “I think Ibuprofens.” She was able to continue all of her normal activities both at work and in her daily life. After the September 8,1999 slip and fall at East Jefferson General Hospital she experienced extreme lower back pain that she had not felt after either of the two recent car accidents. She also testified that as a result of the fall,
I was having pains in my left leg. I was having pains in my right leg. They were radiating down my leg, like |4burning and tingling. And, then, it got to the point where it started going to my toes.
She complained to the emergency room doctors that her entire back was in pain. On September 10, 1999, East Jefferson had her examined by Dr. Tamimie and Dr. Hawley. She complained to them that she was “having headaches then, stiffness all over, pain all over. Pain seriously in the lower part of my back.” She began doing physical therapy through Dr. Tamimie’s *153 office, but discontinued it after a few days “because I was in real, real, awful pain.”
Drs. Tamimie and Hawley ordered an MRI on her lower back which Dr. Hawley reviewed. She then went to see Dr. Meyers on October 5, 1999, who recommended physical therapy and “light-duty, ten-pounds restriction.” At first she went to physical therapy three times a week which was later reduced to two times per week. Dr. Meyers prescribed several medications but she could not recall what they were.
She went to see Dr. Mímeles on October 18, 1999, based on a referral by Dr. Tami-mie. Claimant testified that the only advice Dr. Mímeles gave her was to go back to Dr. Meyers who he knew to be a fine doctor. She further testified that she was instructed by Mrs. Peggy Venture from East Jefferson to visit Dr. Mímeles a second time. Again, according to the claimant, Dr. Mímeles commented only on the fact that she was seeing Dr. Meyers. He made no mention of what work duties if any she should be capable of undertaking.
Claimant attempted to return to work on December 7, 1999, when she was expected to perform all of her regular duties:
I told them, at that point, that I couldn’t continue to do this, because it was causing me pain. I told it to my supervisor. And, she told me, she said, “Well, they knew that they didn’t have light-duty in housekeeping | .¡department anyway, before they even sent you back here.” Because I was told that by her, Mrs. Peggy Venture, in the beginning, they didn’t have light-duty work. That’s why they put me out from October the 6th. Then, she said, ‘Well, take your time, rest if you have to.” And that was it.
Claimant continued under those conditions until December 15, 1999, at which time she was switched over to answer the phone on the fifth floor. From December 7, 1999, until December 15 she worked in extreme pain. She went to see Dr. Meyers on December 14.
On December 16, 1999, claimant was shifted to the dietary department. The duty there caused her such pain that it reduced her to tears which she reported to her supervisor who told her,
... that she would contact Mrs. Peggy Venture, because I had mostly spoke with her all the time, she would contact Mrs. Peggy Venture the next day, which would be December 17th. But, I haven’t heard from Mrs. Peggy Venture nor anyone else since that.
Claimant was in such pain that she was unable to work after that day. She testified that no one ever explained to her why she was assigned to do jobs that continued to cause her such pain. She further testified that Mrs. Peggy Venture called her at her home the next day, December 17, 1999, and told her:
“You know, I heard you left in pain crying. Maybe we can find something else for you to do.” And, I just really never heard from her since then.
Claimant testified that for the next two months she had pain in her lower back and legs, headaches, “pains just from top to bottom.” She continued treating regularly with Dr. Meyers until June 20, 2000. He gave her an epidural injection. As a result of a mediation on February 16, 2000, she was supposed to be offered a chance to return to work under appropriate light duty restrictions. She expected | ^someone from East Jefferson to contact her with a light duty assignment, but no one ever did. She was fired on February 24, 2000, for missing a corporate compliance meeting which she did not think was mandatory. She testified that the same instruction was offered repeatedly and could easily be made up. She has not worked since that time. East Jefferson produced copies of *154 correspondence notifying claimant of the mandatory nature of the meeting.
On February 18, 2000, claimant slipped and fell in a wet area in a Winn-Dixie store. Up to that time she had experienced no amelioration in her symptoms arising out of her fall at East Jefferson. She testified that the pain she experienced in the fall at Winn-Dixie was nothing in comparison with the fall she experienced at East Jefferson, because at East Jefferson she “fell completely on my back.”
At the time of her Winn-Dixie fall she was still being treated by Drs. Haydel and Meyers. In connection with the Winn-Dixie fall she also started seeing Drs. Abraham Rudnick and Dr. Bickman. She underwent physical therapy with Dr. Rud-nick at the same time that she was still undergoing physical therapy with Dr. Meyers.
On May 31, 2000, she went for another MRI of her lower back as ordered by Dr. Rudnick. This MRI revealed a herniation of the L5-S1 lumbar area, as a result of which, Dr. Rudnick referred her to Dr. Charles Billings. Dr. Meyers released her to Dr. Billings at this point and recommended surgery.
On July 17, 2000, Dr. Rudnick ordered a myelogram and a CAT scan of her lower back. Claimant testified that these tests showed herniation as well as bulging at L2, L3, L4, L5, and SI.
Claimant testified that after reviewing X-rays from East Jefferson, Dr. Billings told her that surgery would be in her best interest. She went back to Dr. |7Mimeles in October of 2000. He did not recommend surgery at that time. She did not see Dr. Mímeles again after that. At the time of trial her pain had not improved. She cannot return to her work in the East Jefferson housekeeping department because both sitting and standing for any period of time is very painful for her:
Just to stand up and wash my hair, the bottom of my back feels like a hole is in it. Just to even get in my car sometime and get out causes me pain.
At the time of trial she was taking Vico-din four times a day. Before going on Vicodin she had been on Darvocet. She used to work out regularly at Puritan Sports, but had not been back since her fall at East Jefferson.
In August of 2001 she was involved in another automobile accident, when she was rear ended at a red light.
On cross examination, claimant admitted that after the June and July of 1999 auto accidents she was unable to engage in biking, swimming, health club workouts, etc. She testified that she told Dr. Haydel about her fall at East Jefferson on September 8, 1999, but there is no mention of it in his records:
Q. And, in fact, Mrs. Hobson, as of December 1999, when he released you, he still — it was your treating doctor’s position at that time, Dr. Haydel, that your problems were the result of the July 26th, 1999 accident; isn’t that correct?
A. My problems were the result of the July 26th accident?
Q. Yes.
A. That I was experiencing at that time?
Q. Yes. When he released you in December 1999?
A. Yes. That would be correct.
Is At Dr. Mímeles’ behest, Dr. Fleming conducted EMG and nerve conduction studies of the claimant’s back and legs, all of which came back in the normal range.
*155 She filed suit against Winn-Dixie alleging that she suffered permanent disability as a result of the fall at Winn-Dixie.
Dr. Meyer only recommended surgery in August of 2000, after the Winn-Dixie accident.
Dr. Mimeles testified that when he first saw the claimant on October 18, 1999, he found no objective findings, only subjective complaints and restricted motion. His review of her MRI indicated only degenerative changes. He testified that the September 17, 2000 lumbar MRI CAT scan and the myelogram showed disk herniation at L5-S1 that had not existed at the time of the 1999 MRI and EMG.
Dr. Mimeles testified that it was a “no brainer” that if the original tests were in the normal range, but the test results were definitely different after the fall at Winn-Dixie, then the injury-abnormality, in this case the herniated disc, cannot be attributed to the earlier fall at East Jefferson.
Dr. Mimeles testified that:
Based on two negative studies, there is not a structural mechanical problem going on. There is not a ruptured disk, not a fissure, there’s not a broken bone. So, we’re at a soft tissue injury.
Everybody has ... different feelings. At six to eight weeks, this should be well on its way to resolving. Now, somebody asked me — at that time, she goes back to see Dr. Meyers, and he says, you know, I think she ought to go back, “Yes, she can go back, but it ought to be on light-duty for a while longer.” I have no problems with that. At this point in time, I’m thinking that I’ve done two diagnostic studies. They’re essentially normal. And, jfla soft tissue injury two months down the road should be well on its way, if it’s not back, but almost totally normal to almost normal.
When asked why he thought that as late as December 13, 1999, Dr. Meyers returned claimant to light-duty work, Dr. Mimeles responded:
I can’t speak for Dr. Meyers. When I get into soft tissue, and if you look at his notes, he mentions that this is a soft tissue sprain. He is not talking about a herniated disk, at least to — now, when you get into soft tissue injuries, I’m looking at notation, as a matter of fact, October 5th, the second page, “Findings suggest a cervical and lumbar strain. Light-duty work is advised.” That’s October 5th. You know, I’m talking about a month later even.
Dr. Mimeles went on to explain that he felt soft tissue injuries should resolve themselves in eight to ten weeks, but that Dr. Meyers might be of the opinion that it might take a little longer. Dr. Mimeles conceded that the estimated time in which a soft tissue injury should resolve itself is a matter concerning which reasonable medical practitioners could differ.
Dr. Mimeles said that the epidural that Dr. Meyers prescribed for the claimant in January of 2000 would not have been for a soft tissue injury:
If you’re getting an epidural, you’re usually getting an epidural for degenerative disk disease, nerve root inflammation, something around the spinal canal, because you’re putting this cortisone shot all the way down in the spinal canal. [Emphasis added.]
Dr. Mimeles could only offer conjecture as to why Dr. Meyers prescribed the epidural in January:
[Claimant] possibly continued to complain of pain down the leg, albeit, the diagnostic studies were negative. And, possibly, you know it’s an invasive procedure. It’s a stick. It’s pretty innocuous and benign to do an epidural steroid injection, but I can’t sit here *156 and give you a definitive answer why Dr. Meyers decided to do that. [Emphasis added.]
ImBecause epidurals are not indicated for soft tissue injuries, claimant argues that we should infer more serious injuries. This would be rank speculation, not reasonable inference where nothing in Dr. Meyers’ records indicate more serious injuries, or even a suspicion of more serious injuries, or what the nature and cause of any such injuries might be.
Dr. Mímeles explained his reading of the MRI performed on the claimant in September of 1999 after she fell at East Jefferson:
The radiologist does not mention any disk herniation, protrusions or bulges. I think I mentioned at one place that I saw, maybe, a slight bulge at 4-5, that he didn’t mention. And, again, this is kind of to each his own. But, when you really look at it, the disk in question is not even at 4-5. Nobody talks about disk pathology at 5-1, which is the disk that herniated.
When asked if the East Jefferson fall could have possibly caused what might be interpreted as a bulge on the September, 1999 MRI, Dr. Mímeles responded:
That bulge is a possibility that it could have. It’s a moot question, because it has nothing to do with the pathology in question with the disk at L5-S1. [Emphasis added.]
When asked if it were possible that the February Winn-Dixie accident aggravated the injury claimant sustained at East Jefferson, Dr. Mímeles explained:
It could. It could. But, we’re talking hypothets. Now, when you get into what actually happened in this case, and you do another MRI and the myelogram CAT scan, there’s no mention of any pathology at 4-5. So, the disk in question, causing her pain down the leg, and I guarantee, if Dr. Meyers was here right now or Dr. Billings, and you’d ask them what level they were going to talk about doing surgery, if the patient consents to have surgery done, it’s at L5-Sl. So, dancing around a slight bulge that could have been caused by the accident or what is was caused by, is pretty much a moot question, because that has no more bearing on this case than the Indisk at Ll-2, you know, as far as I know — * * * the only disk is found is at 5-1.
The trial judge awarded claimant all past, present and future, medical benefits and expenses. We find that this award should be amended so that it does not include billings from Dr. Haydel because Dr. Haydel’s records (he did not testify at trial) contain the following notation:
The functional dynamics of the accident as described by the patient and the overall results of the physical exam and orthopedic tests determines more probable [sic] than not that the current condition is a result of the accident which occurred on 06/08/99, and the injuries were derived from the reported mechanism of insult. [Emphasis added.]
Thus, in the face of Dr. Haydel’s conclusion that the problems for which he was treating the claimant were most likely attributable to the automobile accident that occurred prior to the fall at East Jefferson, claimant has failed to prove any entitlement to recover medical expenses from East Jefferson incurred with Dr. Haydel.
Likewise, future medicals shall not include any operation to correct the problem at L5-S1. There is no evidence of that problem following the fall at East Jefferson in September of 1999. That problem does not surface until after the fall at *157 Winn-Dixie. There is no testimony and no medical records to relate that problem to the fall at East Jefferson. To the contrary, Dr. Mímeles testified emphatically and convincingly that, to a medical certainty, the problem at L5-S1 was unrelated to the East Jefferson fall, and must be presumed to have originated with the fall at Winn-Dixie.
Dr. Meyer’s report from his first examination of the claimant on October 5, 1999, concludes with the following:
| ^Findings suggest a cervical and lumbar strain. Light duty work is advised with no lifting more than 10 pounds. She is to return in three to four weeks. We will re-assess her condition following a course of physical therapy. [Emphasis added.]
On November 2, 1999, Dr. Meyer reported that:
It is my impression that Ms. Hobson has a cervical lumbar strain with associated degenerative disc disease.
When Dr. Meyer saw claimant in early January of 2000, he noted that she had returned to work “six days ago” and complained that a moderate amount of bending aggravated her symptoms. However he reported that:
Examination reveals no objective findings in the lower extremity. Deep tendon reflexes, motor testing, and sensation are normal. Neuralgic testing is also normal in the upper extremities. I have recommended a lumbar epidural steroid injection as her previous MRI only revealed borderline stenosis and some degenerative disease. She is to continue her light duty work and Motrin is prescribed. She is to return in two months. [Emphasis added.]
On February 8, 2000, Dr. Meyer prescribed Motrin and .Flexeril, but ordered a cessation to physical therapy as it was ineffective. He continued to recommend light duty work, but once again noted no objective symptoms.
On March 28, 2000, Dr. Meyer wrote the report of his visit with the claimant following her fall at Winn-Dixie:
Mary Hobson presents 03/28/00 with lower back and bilateral leg pain. She reports going to Charity on 2/15/00 because of pain and, at that time, radio-graphs were taken of the thoracolumbar spine, which are reviewed today and are normal. She then reports slipping on a wet floor at Winn-Dixie on 02/18/00 and landing directly on her buttocks and left leg. She describes a twisting injury to the leg. This injury aggravated her pre-existing problem. Radiographs were taken on 02/18/00 at Ochsner of the lumbar spine. I hshave reviewed these and they are essentially normal. She is on Motrin.
.... Findings are suggestive of a lumbar strain. Light duty work has been recommended, and is to be continued if work is available.... [Emphasis added.]
The claimant makes much of the statement above in Dr. Meyer’s report that: “This injury aggravated her pre-existing problem.” However, this cannot be read to mean that the herniated disc at L5-S1 has anything to do with a pre-existing condition. There is nothing in the record to contradict Dr. Mímeles’ convincing and logical explanation of why it is a “no brain-er” that claimant’s herniated disc has nothing to do with her fall at East Jefferson.
On April 18, 2000, when Dr. Meyer examined the claimant he noted lower back, neck and bilateral leg pain. However, he made no new findings.
On June 20, 2000, Dr. Meyer reported that:
HISTORY: Mary Hobson presents 6/20/00 with lower back and bilateral leg *158 pain as well as neck pain and numbness in both hands. MRIs were ordered by Dr. Rudnick and those reveal a herniation at L5-S1 directed to the left. No significant findings were noted in the cervical spine.
PHYSICAL EXAMINATION: Examination at this time reveals symmetric and equal deep tendon reflexes in both the upper and lower extremities with normal motor testing and sensation.
IMPRESSION: It is my impression that Ms. Hopson’s symptoms may be x-elated to her lumbar disc herniation. She also has symptoms in the upper extremities, which may be related to peripheral nerve entrapment syndrome. [Emphasis added.]
PLAN: EMGs are advised of her upper extremities along with a myelogram and CT of the lumbar spine. Flexeril and Naprosyn are prescribed.
The July 17, 2000 report on the myelo-gram noted:
|14Piffuse bulging of the L3-4 and the L4-5 discs is evident. There is a broad based central disc herniation identified at L5-S1 which is slightly eccentric to the left.
Dr. Meyer’s report of August 11, 2000 notes the findings of the July 17, 2000 myelogram and makes the following observations:
Physical exam reveals increased back pain with straight leg raising. Deep tendon reflexes, motor testing, and sensation are normal in the upper and lower extremities. Examination of the upper extremities reveals no objective findings.
It is my impression that Ms. Hobson has a lumbar disc herniation, which would benefit from surgical treatment. She is referred to Dr. Billings for evaluation and possible surgery. EMGs are still pending, as noted above. [Emphasis added.]
On August 22, 2000, Dr. Meyer reported that claimant had seen Dr. Billings and “is considered a surgical candidate to address her lumbar disc herniation.”
Dr. Billings’ reports of examinations on September 22, 2000, January 25, 2001, April 26, 2001, August 21, 2001, November 20, 2001, all refer to surgery for lumbar disc herniation which is identified at L5-Sl.
East Jefferson disputes neither the occurrence of nor the employment related nature of her fall on the premises. An intervening cause does not exist when an employee is involved in a second accident which aggravates a work related injury. George v. Marcantel Feed Stores, Inc., 434 So.2d 440 (La.App. 3 Cir.1983). The aggravation is regarded as a development of the initial accident even though it occurs away from the employer’s premises. Id.
At first, claimant testified that when she went back to work under medical orders for light-duty work no job modifications consistent with the medical directive were offered to her. However, on cross-examination, .regarding the |^modifications to her job duties when she went back to housekeeping in December of 1999, claimant gave the following testimony:
Q. They didn’t require you to mop, did they?
A. No. That’s the only thing I didn’t do, was mop.
Q, Well, they modified your job, they didn’t require you to mop.
A. To an extent.
Q. They didn’t require you to do the trash, lift the trash?
A. They didn’t require it?
*159 Q. That’s right. They modified your job. They didn’t require you to do the trash.
A. They didn’t require me to do the trash, but I had to do it. [Emphasis added.]
[[Image here]]
They told me I didn’t have to mop and not to pull the trash, but if the guy’s not there helping me do it, it’s my job restriction, I have to do it.
BY MR. SUTTON:
Q. I’m going to refer you to this deposition in this case, Page 102, and make sure I’m reading this correctly. Page 102, line 1, Question: “Did they, in any way, modify your housekeeping duties to fit within your — ”. Answer: “Schedule.” Question: “Restrictions?” Answer: “My restrictions, yes, to an extent, because mopping was out. I didn’t have to mop. And, I didn’t have to pull any trash, because that was part of what other than that, everything I did.”
A. I didn’t have to pull any trash, let’s just say on that one day. But, I did that schedule for my week, three or four days.
Claimant underwent the following cross-examination regarding communications with her employer after her last day on the job:
Q. And, you testified, Mrs. Hobson, that after December 16th, 1999, your last day of work, you never heard back from Ms. Venture or anyone from East Jefferson about trying to return to work?
A. She called me that morning to find out what happened that night. She didn’t say, Mary, return to work. She asked me what happened. I told her that it was causing me problems, that I was in pain. I told her that I was going back to see Dr. Meyers. She was saying that you need to come back to |1fiwork. If you miss such and such days, you will be written up for it, blah, blah, blah, blah.
THE COURT:
No blah, blah, blah, blah blah.
THE WITNESS
Me and Mrs. Peggy Venture have — she said a few words and I said a few words and, basically I just hung up the phone.
BY MR. SUTTON
Q. Isn’t it a fact that after your last day of work, Ms. Venture called you many times—
A. No.
Q. — to talk about coming back to work?
A. No, sir. No, sir. No, sir.
[[Image here]]
East Jefferson’s attorney then confronted the claimant with her inconsistent deposition testimony:
Q. Question: “Did anyone from the hospital call or write you after December 16th?” Answer: “Peggy Venture called my house frequently.” Question: “And, what did Peggy and you talk about?” Answer: “We talked about why I left. I told her to talk to the lady in dietary. I ain’t going there right now. Don’t ask me. And, they would find something under the restrictions by Dr. Meyers, which they never did.” So, in fact, Ms. Venture did followup with you numerous times after December 16th?
*160 A. I wouldn’t say numerous times. She had called me on one occasion.
Q. She called you frequently.
A. That was beforehand. That was before December the 16th. She called me before' — ■
THE COURT
I got your point, Counsel. You can move on.
Claimant could not recall having received any letters from East Jefferson in January about returning to work.
|17Ms. Peggy Venture described herself as a registered nurse in the Team Member Health Department. It was her task to investigate accidents and to follow the progress of employees from injury through their return to work. In doing so, she would receive the employee medical reports and would monitor and coordinate their medical treatment. As a result of claimant’s accident and the medical reports Ms. Venture received from claimant’s physician’s, Ms. Venture directed that claimant be assigned light-duty responsibilities. However, Ms. Venture admitted that she had no direct knowledge of whether the work actually performed by the claimant pursuant to her directive was within the limitations prescribed by claimant’s treating physician. She explained that although she had received letters from Dr. Meyer in October and from Dr. Mimeles in November indicating that claimant could return to light-duty work, there was no light-duty work available until December. On December 7, 1999, Ms. Venture reported back to the Environmental Services Department, but had problems with the work assignments there, so claimant was transferred to the dietary department where she was assigned to wrapping silver.
Ms. Venture also testified that she did not recall having talked to claimant after she stopped working in December. She conceded that it would be improper to “write up” the claimant for going to the doctor for a work-related injury. Ms. Venture also conceded that what claimant testified she actually did on the job would not have been within light duty restrictions, but she contended that, “That’s not what I placed her back to do.” However, she admitted that she had no personal knowledge of what work claimant actually performed. The hearing below concluded with the following colloquy between the judge and Ms. Venture:
J^THE COURT:
I just need a little clarification, Ms. Venture. It took you, what, about a month and a half to locate what you call a light-duty position?
THE WITNESS:
Yes, ma'am.
THE COURT:
For—
THE WITNESS:
Mrs. Hobson.
THE COURT:
—Mrs. Hobson. What was that position?
THE WITNESS:
She’d be working within her previous department, working in Environmental Services. It was my understanding that she was going to be doing things such as dusting—
THE COURT:
What was the position? I didn’t ask you about the duties. What was the position?
THE WITNESS:
Her same position.
THE COURT:
It was the same position?
THE WITNESS:
Yes.
*161 THE COURT:
Housekeeping?
|1flTHE WITNESS:
Yes, ma'am.
THE COURT:
Okay. So, how did housekeeping become a light-duty position almost two months after she had been released to light-duty? What prevented you all from modifying those duties then in October, that you were able to do now in December; what prevented that?
THE WITNESS:
At the time, we did not have a light-duty program established. Agreements with the supervisors and their partners.
THE COURT:
Wait a minute. Are we talking about East Jeff General Hospital?
THE WITNESS:
Yes, ma'am.
THE COURT:
And, ya’ll have people getting hurt every day over there.
THE WITNESS:
Yes, ma'am.
THE COURT:
In housekeeping.
THE WITNESS:
Yes, ma'am.
THE COURT:
And, it wasn’t until this lady was hurt, ya’ll started that you establish a first— now, this is what you’re telling me, | ¡>nthe first light-duty position, this is my understanding, in housekeeping, was not established until December 1999?
THE WITNESS:
No, ma'am.
THE COURT:
Okay. Clear that up for me.
THE WITNESS:
Okay. Prior to, say, October, a light-duty program had been being discussed. And, it was going to different people who were speaking in regards to establishing a light-duty program. Up until then, we did not have a light-duty program.
THE COURT:
So, if you were injured at East Jeff, and you were performing your regular duties, which were above light duty, that would be medium heavy; is that right? Then you have light and sedentary? So, if you worked in a heavy or a medium position, and you were injured on one of those jobs, the doctor released you with restrictions, saying you could only do light-duty, prior to December 4th or whatever ya’ll had, what day you had, those persons could not come back to work at East Jeff; is that what you’re telling me?
THE WITNESS:
They could come back to work if their job could fit within their restrictions, depending on what their restrictions were.
THE COURT:
Uh-huh. Okay. So, the light-duty position you had for her would have been a modified housekeeping positing [sic] in Environmental—
THE WITNESS:
Environmental Services.
THE COURT:
|21 — Services.
THE WITNESS:
Yes, ma'am.
THE COURT:
All right. Answering the phone at the nurse’s station, is part of Environmental Services?
THE WITNESS:
No, ma'am.
*162 THE COURT:
Okay. How did she get there? Well, she had difficulty—
THE WITNESS:
Right.
THE COURT:
—performing what you all said was light-duty, she had problems with that. Okay. So—
THE WITNESS:
We had contacted departments throughout the hospital, explaining to them that if we had people who had restrictions, could they possibly use light-duty assistance in different areas about their need for assistance.
THE COURT:
Okay. So, if on any given day, you have an employee with restrictions, who can’t perform the light-duty position that you had for her, she would report to work and, then, knowing that she can’t do the job, you would find other positions to put her in at the hospital that were available for that day?
THE WITNESS
Yes, ma'am.
JjgTHE COURT:
That would also meet the requirements of light-duty with those restrictions. Now, what if she reports one day and no department needs someone, what do you do then?
THE WITNESS:
Throughout the whole hospital?
THE COURT:
Uh-huh.
THE WITNESS:
I generally can find a department—
THE COURT:
Well, what if you can’t? Let’s say you can’t. What do you do with them?
THE WITNESS:
If I could not find a place for them to work within their physician’s restrictions, then we would look elsewhere.
THE COURT:
So, technically, there was no position for her after she could not perform the duties in housekeeping that had been modified, there really was no position for her. It was just every day you come to work, we’re going to try to find somewhere to put you; is that what we had gotten to?
THE WITNESS:
That may be the case on some occasions.
THE COURT:
Well, tell me this: Your December 29th letter, do you need to see it again?
THE WITNESS:
I still have it here.
ImTHE COURT:
You say, “As per our discussions, we have a limited duty program in place, and can accommodate your physical restrictions.” And, she was to report to work on January 3, of 2000; is that right?
THE WITNESS:
Correct.
THE COURT:
Okay. What does that mean, “temporary modified duty?”
THE WITNESS:
That means that temporarily they are unable to perform their previous position.
THE COURT:
So, what position did you have for her when you sent her this letter December 29th? When she came to work on the 3rd, where was she to go, what was she to do?
THE WITNESS:
She was to report to environmental services.
*163 THE COURT:
Environmental Services. To do what?
THE WITNESS:
The functions that I had discussed with Mr. Grayline, dusting
THE COURT:
To do the same thing that she came to do in December, right?
THE WITNESS:
\9AI think I’m confusing you. The letter that I sent to her on the 29th of December, was for — she could have done light-duty in housekeeping. She could have done, depending on where she was— based upon my letter of December the 29th, I would not have put her back into a department, where she previously stated she had a problem. She would have gone to another answering phones, perhaps, in cardiology or multiple places throughout the hospital that do require assistance on a day to day basis.
THE COURT:
Anything else? Thank you, ma'am. You can step down.
We infer from this colloquy, supported by claimant’s testimony, that the work offered by East Jefferson on several occasions was not appropriate to her limitations. We find that the trial court could reasonably infer, as it obviously did, that East Jefferson did not really have a light duty work program compatible with claimant’s limitations. We find within the context of claimant’s repeated assignments to inappropriate job duties, that claimant’s actions were reasonable. East Jefferson does not contest the plaintiffs initial entitlement to benefits. We find no manifest error in the trial court’s implicit finding that the claimant did nothing subsequently to cause her to forfeit that entitlement. Based on all of the medical evidence discussed earlier in this opinion, we find no manifest error in the trial court’s finding that the claimant continues to be injured as a result of her fall at East Jefferson and that her injury was aggravated by a subsequent injury.
However, we find that the trial court erred in awarding the claimant penalties and attorneys fees. Claimant’s “Disputed Claim For Compensation” form complains primarily of a discontinuance of benefits effective December 1, 1999. Thus, this case is essentially a claim for discontinued benefits under La. R.S. 23:1201.2, not a claim for untimely benefits under La. R.S. 23:1201. This is | j»Kdispositive of the question of penalties because La. R.S. 23:1201.2 does not provide for penalties. In making this statement we follow the lead of the Supreme Court in J.E. Merit v. Constructors, Inc. v. Hickman, 2000-943 (La.1/17/01), 776 So.2d 435. We also adopt the excellent analysis found in Lejeune v. Laurrence Habetz Roofing Co., 2000-1743, p. 4-5 (La.App. 3 Cir. 4/4/01), 782 So.2d 1181, 1184:
The supreme court recently discussed the difference between Louisiana Revised Statutes 23:1201.2 and 23:1201(F), stating:
In instances where the employer fails to commence payment of benefits, penalties and attorney’s fees are authorized under La. R.S. 23:1201 F, unless the claim is reasonably controverted. See McCarroll v. Airport Shuttle, Inc., 00-1123 (La.11/28/00), 773 So.2d 694. However, because the instant case involves discontinuation of benefits rather than failure to provide benefits, La. R.S. 23:1201.2, not La.R.S. 23:1201 F, [2000-1743 La.App. 3 Cir. 5] applies. See Williams v. Rush Masonry, Inc., 98-2271, p. 6 (La.6/29/99), 737 So.2d 41, 45 (“[s]ince this 1995 amendment, Section 1201.2 now addresses solely the discontinuance of payment of claims, while Section 1201 now addresses solely the timeliness of commencement of benefit payments and timeliness of continued payments.”)
*164 J.E. Merit Constructors, Inc. v. Hickman, 00-943, p. 5 (La.1/17/01); 776 So.2d 435, 437 n. 6 (alteration in original).
As to attorneys fees, claimant must show that East Jefferson’s decision to discontinue benefits was arbitrary and capricious:
Louisiana Revised Statute 23:1201.2 provides that reasonable attorney’s fees are awarded as a penalty under the workers’ compensation law when an employer discontinues payment of benefits, and “such discontinuance is found to be arbitrary, capricious, or without probable cause.... ” “Arbitrary and capricious behavior is willful and unreasonable action, without consideration and regard for the facts and circumstances presented.” J.E. Merit, 776 So.2d at 437-38. “An award |Mof attorney’s fees in a workers’ compensation case is essentially penal in nature, as it is intended to discourage indifference and undesirable conduct by employers and insurers.” Id. “Attorney’s fees should not be imposed in doubtful cases, where a bona fide dispute exists as to the employee’s entitlement to benefits, and the mere fact that an employer loses a disputed claim is not determinative.” Id. Furthermore, Louisiana Revised Statute 23:1201.2 does not provide for an assessment of penalties in the case of discontinuance of payment. Insurance Co. of North America v. Labit, 99-2448, 992449. (La.App. 1 Cir. 11/15/00); 772 So.2d 385.
Lejeune, p. 5, 782 So.2d at 1184.
The record clearly does not support claimant’s entitlement to medical expenses for future back surgery or for treatment by Dr. Haydel. As to the other medical expenses and benefits in general, the claimant was involved in so many other accidents that East Jefferson was not unreasonable in concluding that claimant’s continued incapacity was not attributable to her employment related fall. Such a conclusion was supported by Dr. Mímeles. East Jefferson’s conclusion that it had grounds for terminating claimant in February of 2000 when she failed to attend the mandatory employee meeting is supported by credible evidence. The fact that the workers compensation judge subsequently decided that claimant was entitled to be on disability at that time does not mean that East Jefferson was arbitrary and capricious:
[T]he only inquiry is whether the employer acted arbitrarily, capriciously and without probable cause in discontinuing the payment of compensation and medical benefits so as to warrant imposition of attorney’s fees under Section 1201.2. “Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation.” Brown, 98-1063 at 8-9, 721 So.2d at 890, referring to Black’s Law Dictionary 104, 211 (6th ed.1990).
| ^Awards of penalties and attorney’s fees in workers’ compensation are essentially penal in nature, being imposed to discourage indifference and undesirable conduct by employers and insurers. Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382. Although the Workers’ Compensation Act is to be liberally construed in regard to benefits, penal statutes are to be strictly construed. See International Harvester Credit v. Seale, 518 So.2d 1039, 1041 (La.1988).
The fact that an employer is subjectively motivated to avoid paying compensation is not determinative. Neither is the fact that an employer loses a disputed claim. Sharbono, 97-0110 at 11, 696 So.2d at 1389 (penalties and fees are never assessed automatically against the losing party); Winters v. City of Shreveport, *165 257 La. 245, 242 So.2d 236 (1970); Eaves v. Louisiana Cypress Lumber Co., 253 La. 741, 219 So.2d 771 (1969). On the other hand, the fact that no witnesses saw the alleged accident or that there was no immediate report of an accident by the plaintiff does not necessarily justify the denial of benefits. The employer must adequately investigate the claim, and the crucial inquiry is whether the employer had an articulable and objective reason for denying or discontinuing benefits at the time it took that action.
Williams v. Rush Masonry, Inc., 1998-2271, p., 8-9 (La.6/29/99), 737 So.2d 41, 45-46.
Those portions of the judgment sustained by this Court were based on the manifest error standard of review. There is definitely enough evidence in the record to support a contrary decision by the lower Court. As we find that East Jefferson had valid reasons supported by credible evidence, it was error for the trial court to assess penalties and attorneys fees. Broun v. Texas-LA Cartage, Inc., 1998— 1063 (La.12/198), 721 So.2d 885.
For the foregoing reasons we affirm that portion of the judgment below awarding benefits to the claimant, with the exception of medical expenses for Dr. Haydel and .future medical expenses for surgery for the herniated disc at L5-S1. | gsWe also reverse that portion of the judgment awarding attorneys fees and penalties to the claimant. All parties to bear their own costs.

AFFIRMED IN PART AND REVERSED IN PART

McKAY, J., CONCURS IN THE RESULT.