JOAN BERNARD ARMSTRONG, Chief Judge.
 

 | 'The plaintiff-appellant in the main demand and defendant-appellee in reconvention, Eulister Wilson, appeals
 
 pro se
 
 a judgment rendered by the First City Court of the City of New Orleans on September 11, 2008, dismissing his claim with prejudice against the defendant-appellee in the main demand and plaintiff-appellee in reconvention, Irshad Daniel Rahman. Mr. Rahman in turn appeals the dismissal in the same judgment of his reconventional demand against Mr. Wilson.
 

 This is a fact intensive case involving no significant legal issues. Therefore, our review essentially consists of reviewing the record as a whole to determine whether the trial judge committed manifest error in reaching the conclusions he reached.
 

 Mr. Wilson filed suit on June 20, 2007, claiming that Mr. Rahman owed him $25,000.00 for construction work he allegedly performed on properties owned by Mr. Rahman located at 4121 Fountainbleu Drive and 5420 Clara Street in New Orleans. On November 28, 2007, Mr. Rah-man filed an- answer and reconventional demand based on theories of breach of contract and constructive abandonment and asking for unspecified damages for:
 

 |21) Cost to repair substandard work;
 

 2) Cost to complete work left uncompleted;
 

 3) Loss of rent;
 

 4) Any and all other damages.
 

 In his written reasons for judgment issued contemporaneously with the judgment, the trial judge dismissed both parties’ claims, finding that Mr. Wilson did
 
 *180
 
 not complete the job timely and Mr. Rah-man was in part responsible for the delay because he pulled Mr. Wilson off of one job to have him work on another unrelated job. The trial judge further found that Mr. Wilson did not perform all the work he performed in a workman like manner and that he failed to supervise or hire someone to supervise his employees or subcontractors. The trial judge also found that Mr. Wilson hired people who were not qualified or who failed to perform the work they were hired to do, specifically the electrical, plumbing and sheet rock contractors.
 

 In addition to ruling against Mr. Rah-man’s claim in reconvention because he pulled Mr. Wilson off of the jobs for which he had contracted to work on another job, the trial judge also found that Mr. Rahman was not entitled to some of the damages he claimed. Those damages were claimed by Mr. Rahman in connection with payments he was allegedly forced to make to other contractors he hired to correct and finish the work he hired Wilson to do. However, the trial judge found that some of what Mr. Rahman claimed in this regard was not for work that Mr. Wilson had contracted to do.
 

 All of these are factual findings subject to manifest error of review.
 

 The trial on the merits commenced on July 31, 2008. Eulister Wilson was the first to testify. He testified that in March of 2006 he entered into a written |3agreement with Mr. Rahman to do work on his 4131 Fountainbleu Drive property in the sum of $66,641. This contract is dated March 15, 2006. While Mr. Wilson filed suit in his name and that of his limited liability corporation, E & S Construction, Mr. Eulister is not shown as a party to the contract; only his limited liability corporation, E & S Construction, L.L.C. is. The contract provided for payment as follows:
 

 Upfront materials deposit of $18,247.00 and 3 progressive payments of $13,917.00 leaving a retainage balance of $6,643.14 to be collected at completion of project.
 

 The contract stated an estimated time of completion of 90 days and the contract provided that the “term of this Agreement will begin on the date of this Agreement and will remain in full force and effect until completion of the Services.” Paragraph “9” of the Agreement is entitled in boldface
 
 “Time of the Essence
 
 ” and, as indicated in the title, provides that time is of the essence and that: “No extension or variation of this Agreement will operate as a waiver of this provision.” Although Paragraph “5” of the Agreement is given the boldface title,
 
 “Non Performance Penalties
 
 ” the contract is silent as to penalties. Annexed to the contract in evidence is an “Invoice/Proposal” along with a detailed listing and cost of each item of work to be performed under the contract. However, the issue is not so much a dispute over the meaning and scope of the contract, but the quality, quantity and timeliness of the work performed by Mr. Wilson.
 

 Mr. Wilson testified that because of post-Katrina issues there was no electrician available between March 3, 2006 and April 14, 2006. He testified that Mr. Rah-man had an electrician he wanted to use, but that he never showed up. He testified that workmen hired by Mr. Rahman cut out all of the wood flooring and |4left nothing but joists, requiring him to give Mr. Rahman a price on redecking the floor and the stairwell for the back of the house, thereby creating a change.
 

 Mr. Wilson then testified that on April 14, 2006, Mr. Rahman, pulled him off the job to work on his brother’s house. As a result he worked on both Mr. Rahman’s house and that of his brother between April 14, 2006 and September 29, 2006.
 

 
 *181
 
 Mr. Wilson testified that on May 4, 2006, Mr. Rahman put in the first change order which was in writing and entitled, “Change Order # 1.” He also testified that Mr. Rah-man decided to have central air instead of window units, thus requiring a change in wiring which in turn required a change in the panel boxes.
 

 Mr. Wilson then testified that on May 15, 2006, Mr. Rahman pulled him off of the job again, this time to work on property he owned at 5422 Clara Street. At the same time Mr. Rahman had him doing roofing work at 7635 Freret Street.
 

 Mr. Wilson testified that Clara Street had galvanized pipes that needed to be replaced at considerable expense. Mr. Rahman’s indecision concerning the cost resulted in delay.
 

 Mr. Wilson testified that on July 25, 2006, Mr. Rahman issued a change order calling for “major changes” regarding the Fountainbleu property. The record contains a substantial written change order of that date signed by both parties. He testified that at this time he went to his home in North Carolina to work on the new proposal. He testified that he returned to New Orleans a week later with the change order, but that Mr. Rahman put off signing it until August 23. He testified that he did not proceed with the work during the period of time he was waiting for Mr. Rahman to sign the change order. During the period of time during which he | ¿waited for Mr. Rahman to sign the change order he worked on Mr. Rahman’s brother’s house.
 

 Mr. Wilson testified that before he could even get started on the change order dated July 25, 2006 referred to in the preceding paragraph, Mr. Rahman asked for another change order for the work to be done on the Fountainbleu property. A copy of the written change order is in the record signed by both parties.
 

 Next, Mr. Wilson testified that on September 13, 2006, Mr. Rahman called him with instructions that now he wanted him to complete the work he was doing on the Clara Street property. Mr. Rahman also wanted him to give him a price to repair flood damage to a property he owned on Jay Street.
 

 On October 23, 2006, Mr. Rahman again pulled him off of the Fountainbleu property to work on Clara Street.
 

 He testified that Mr. Rahman was aware that he lived in North Carolina and that he went back and forth. He further testified that it was Mr. Rahman’s hope that he would finish Clara Street and Jay Street by the end of February, 2007. Mr. Rah-man told him in December, 2006, that he was taking a month’s vacation to Bangladesh. He left on December 27, 2006, and did not return until the end of January.
 

 He explained that another cause of delay was the fact that Mr. Rahman was to provide materials because he was always in search of cheaper materials. Of course, according to Mr. Wilson, while Mr. Rah-man was in Bangladesh it delayed the job because he was not here to provide materials.
 

 Mr. Wilson testified that he tried unsuccessfully to reach Mr. Rahman in Bangladesh to make arrangements to keep working, but as he was unable to do so, Rhe went back to North Carolina. When Mr. Rahman returned in late January he contacted him in North Carolina and asked when he was returning to New Orleans to finish the projects. He told Mr. Rahman that he would do so as soon as he finished the “little job I was doing out here.” Mr. Wilson explained:
 

 I took on work. I just can’t stand around and do nothing.
 

 I got bills to pay.
 

 
 *182
 
 And so, of course, I didn’t finish the job [in North Carolina] until February 15th. February 15th, I return home, and I worked on all three projects until March 8th.
 

 Mr. Wilson explained that during this period of time he would go home to North Carolina on a Friday and return on the following Tuesday. He went back to North Carolina on March 8th and did not return until March 15th, at which time he worked on the Jay Street property until March 26th.
 

 On March 26th Mr. Wilson testified that he “had to go home [to North Carolina] to take care of some very important business.” On the way his truck broke down and his transmission had to be rebuilt. He testified that he was stuck in North Carolina until April 18th because of these problems with the truck. When he returned to New Orleans on April 19th, Mr. Rahman directed him to work on Founta-inbleu, which he did “intensely” until May 15th. Mr. Wilson testified that during the same period of time he also performed some minor work on Clara Street. He presented Mr. Rahman with a bill for $9,055.00 on May 14th, which Mr. Rahman paid with ill grace. (At this point there is some confusion in the testimony because Mr. Wilson then testified to a figure of $10,955.00 and said that Mr. Rahman gave him a check for $10,000.00.) He then went to North Carolina for a couple of days “to be with my family,” but he left two workers on the Fountainbleu project. On May 17th he received a call from his son saying that Mr. Rahman had laid him and the workers off. He went to see Mr. Rahman at his home on May |719th, at which time Mr. Rahman told him he no longer desired his services. On May 21st he found that he was overdrawn at his bank because Mr. Rahman had stopped payment on the $10,000.00 check.
 

 Mr. Wilson testified that there is a balance due to him $10,943.91 from the various projects he was working on for Mr. Rahman.
 

 On cross-examination he admitted that there were a number of things unfinished that were called for in the contract which he explained by saying that:
 

 You terminate me on the job, of course, the job is incomplete.
 

 He admitted that he did not really get going on the job until a month after he signed the contract, but he had informed Mr. Rahman that he couldn’t get started until he finished another job he was working on.
 

 Mr. Glenn Dexter, an electrical contractor with Malone Electrical Services, was next to testify. He testified that he gave Mr. Rahman a quote for electrical work and that, “Mr. Malone got with him later on and kind of gave him a better deal.” He testified that to his knowledge, Malone was never called out by the contractor to do the job at Fountainbleu. He testified that later they found that some electrical work had been done but that would not have met code. The trial court rejected his testimony as hearsay.
 

 Then Mr. Rahman testified. He testified that he met with Mr. Malone in March of 2006 along with Mr. Wilson. At that time Mr. Malone quoted him a figure of $4,800.00. He testified that Mr. Wilson told him that, “Glynn had an attitude, Glynn didn’t want to do the job.” So Mr. Wilson enlisted his own electricians. However, the first ones he hired botched the job. ‘Thereafter, he and | sMr. Wilson contacted Malone and Malone sent out two men to fix the electrical work for the originally quoted price of $4,800.00.
 

 Mr. Rahman testified that when he signed the original contract, Mr. Wilson did not tell him he had other work he had
 
 *183
 
 to finish before he could begin on his job. He had short term financing on the property so he needed to be able to make it habitable and rentable expeditiously so that he could get long-term financing.
 

 He testified that Mr. Wilson never informed him that Mr. Wilson’s insurance had been cancelled and changed. He testified that the demolition work Mr. Wilson testified to had been done months before he and Mr. Wilson signed the contract. He also denied that he pulled Mr. Wilson off the Fountainbleu job to do work for his brother, Dell: .
 

 [T]he first time I found out that he did some work for my brother is about three days ago, after I read this diary.
 

 He then described a number of items called for in the contract that Mr. Wilson did not perform and/or were performed by others such as Malone. He testified that Mr. Wilson told him he could do the “upgrade” on Clara Street in “about a week’s time.” However, it dragged on for six or seven weeks. He said that on many occasions Mr. Wilson would leave for North Carolina and that when he did so the progress at Fountainbleu would come to a, “Total standstill.”
 

 As to his trip to Bangladesh in December of 2006, Mr. Rahman testified that he had informed Mr. Wilson of his travel plans the previous June and that he had been assured by Mr. Wilson that the work would be completed prior to that time. He confirmed that at the time he return from Bangladesh, Mr. Wilson had three jobs in progress for him. He called Mr. Wilson in North Carolina when he returned from Bangladesh and complained to him that he had promised to be back |9in New Orleans when he returned and he reminded Mr. Wilson that he had long ago informed him that he had a bank deadline.
 

 He then informed the court of the dates he had given checks to Mr. Wilson and how woefully he had underperformed. He testified that he was never informed that copper pipes had been stolen. He explained that as an insurance man he would have known to file a police report. Mr. Rahman testified that the first he learned of it was this day in court. He testified that it was Mr. Wilson:
 

 “[Wjas always coming back with change order, change order, change order. Even when I got my own electrician to do the work, he brought in an electrician, he comes back with a change order number 1 and hits me with $6,600 and says, You owe a balance of $1,400 more. So the whole game played around change orders. And I knew nothing about construction.”
 

 When Mr. Rahman testified that on May 15, 2007, when he gave Mr. Wilson the check for $10,000.00 he informed Mr. Wilson that he did so only on condition that Mr. Wilson would complete the job before returning again to North Carolina. Mr. Rahman testified that in response Mr. Wilson told him that he would work night and day and finish the job in one week, and that he would go nowhere until the job was complete. However, before Mr. Wilson left Mr. Rahman’s house that night he informed Mr. Rahman that his daughter had a “recitation or something” and that he wanted to attend:
 

 I said, Look, I understand family things are important. It’s an occasion for your daughter. It is a bankruptcy for me. And I’ve told you you can’t go.
 

 The next day Mr. Rahman went by several times to check on the job, but there was never anyone there. “I was very, very upset. He had left town.”
 

 11()Mr. Rahman identified photos of the Fountainbleu property taken on May 18, 2007, showing that, “the house was in a total mess.” He testified that he called his
 
 *184
 
 lawyer on May 17th and was advised to stop payment on the $10,000.00 check which he did. At this point he retained Jeff Nichols to finish the job. He identified checks he had paid to Mr. Nichols in the sum of $1,087.00, $3,300.00, and another for $1500.00 that pertained to work on both Fountainbleu and Clara Streets.
 

 He also paid $3,100.00 to Santos Martinez and $450.00 to Mike converse. He also paid $154.00 to Shawn Kins for some carpentry. He paid $600.00 to Raymond Harris:
 

 And at this same time, I was paying a lot of people cash right and left to get anything done. I was picking up people from the street to come and do work.
 

 He went on to testify that he had to pay another contractor approximately $65,000.00 to correct faulty work done by Mr. Wilson on Jay Street and to complete the job on that location. At a later date he had to do a lot of corrective work at the Fountainbleu location. He paid Mr. Chris Haring one check for $1,250.00 and another for $2,600.00 to do the necessary plumbing work on Fountainbleu. After tenants moved in he discovered that the waste from the toilet was emptying directly under the house. He paid Lester LeMeunier $6,500.00 to correct this and other problems. He said that because of the delays the interest rate on the loan he needed increased from 7.75% to 10.9%, not to mention the loss of potential rents.
 

 On cross-examination, Mr. Rahman testified that he did not ask for change orders and that he signed them without reading them and continued to advance money to Mr. Wilson in spite of the fact that he was doing little or no work in return. When asked why he continued to pay for work allegedly not done, Mr. InRahman responded: “I’ve been asking myself the same question.” Mr. Wilson asked him on
 
 pro se
 
 cross-examination:
 

 Q. Why would you just give me money and not read anything about what I’m doing? And to top it off, you signed it.
 

 A. I signed it, because you compelled me to sign it.
 

 Q. In what way [did] I compel you? How did I compel you.
 

 A. I said, What is this? We have a contract. At one time, I do remember having a conversation with you, What is this? We have a contract, and you just keep bringing these things and charge me money.
 

 You said, Man, if that changes, it’s got to be done. Otherwise, the work can’t go on. So, I signed it and I gave you the check every time.
 

 However, Mr. Rahman testified that he read the original contract. Mr. Wilson admitted that the last time he went to North Carolina he told Mr. Rahman that he had to do what the had to do and that his family came first.
 

 Leslie LeMeunier, a licensed journeyman plumber, testified next. He testified that he was paid by Mr. Rahman to fix several sewer leaks under the Fountain-bleu property.
 

 Robert Morris, a licensed building contractor, testified that he inspected Mr. Rahman’s property on Jay Street in the fall of 2007. He testified that the sheet-rock work had been cut very unevenly leaving a three to four inch gap between the old pre-Katrina sheetrock that was above the spoilage line and the new post-Katrina sheetrock that replace the damaged portion of the old sheetrock. He testified that the sheetrock work he found did not meet his standards. Mr. Rahman paid him to correct and finish the Jay Street sheetrock job.
 

 
 *185
 
 Nazeen Rahman, Mr. Rahman’s wife, testified that she was present when Mr. Wilson stated that the work would be done by the end of December. She |12testified that she was present in the house when Mr. Wilson came in May for the $10,000.00 check referenced elsewhere in this opinion and that it was her understanding that Mr. Wilson was not to go back to North Carolina, but was to stay and finish the job. And as to the paper work, on cross-examination she basically admitted that she was not involved and/or had no recollection.
 

 At the end of the trial, Mr. Wilson was allowed to make a statement. He stated that at the time he took the check for $10,000.00 he informed Mr. Rahman of his imminent return to North Carolina, “but I did promise him that somebody would be on the job when I’m gone.” He also stated as to the jagged edged sheetrock, that it was a simple matter to go back in and fix it which had been his intention all along, and that there was no necessity for Mr. Morris to tear out all the work he had done. It was his opinion that it was torn out by Mr. Morris just to inflate his contract price. He admitted that the job was incomplete, but attributed that to his unwarranted premature dismissal from the job by Mr. Rahman. He also stated that he never agreed to do the kind of work required to rectify the sewerage problems and referred to those problems as “hidden costs” for which he would not be responsible under the contract or change orders. He felt that Malone and Mackie overcharged for their work and that he should not be responsible for their excessive charges. He also elaborated on why being asked to work on several projects at once delayed completion.
 

 On final cross-examination, Mr. Wilson acknowledged he had highlighted on Exhibit C all of the many items that remained incomplete on the Fountainbleu property.
 

 The trier of fact may choose to reject all of the testimony of any witness or may believe and accept any part or parts of a witness’ testimony and refuse to | isaccept any other part or parts thereof.
 
 Ladner v. Government Employees’ Ins. Co.,
 
 08-0323, (La.App. 4 Cir. 10/8/08), 992 So.2d 1098, 1101;
 
 Temple v. Schwegmann Giant Super Markets,
 
 95-2491, pp. 4-5 (La.App. 4 Cir. 7/10/96), 677 So.2d 1103, 1105-1106.
 

 In this case we may readily infer that the trial judge chose to believe that portion of the Mr. Rahman’s testimony and that of his witnesses indicating that Mr. Wilson frequently absented from New Orleans during the time he was supposed to be performing work for Mr. Rahman, thereby contributing to the delay of the completion of the projects. Mr. Wilson’s absence from the city also contributed to the finding that he failed to adequately supervise his employees and/or sub contractors. While there may have been some difference of opinion as to how much time Mr. Wilson spent in North Carolina, Mr. Wilson essentially admitted to such absences.
 

 However, the trial judge was also entitled to believe that portion of Mr. Wilson’s testimony leading to the conclusion that Mr. Rahman “was the main cause of the delay by pulling the plaintiff off the main job to do work on other properties.” The documented change orders also support the conclusion that Mr. Rahman was the main cause of the delay.
 

 The testimony of Mr. Rahman along with that of his contractor, electrical and plumbing witnesses permit the reasonable finding by the trial judge that Mr. Wilson did not perform all the work he was hired to do in a workman like manner and failed to supervise or hire someone to supervise
 
 *186
 
 his employees and/or sub contractors on those occasions when he did not do so himself.
 

 Accordingly, we find no manifest error in the trial judge’s reasons for judgment based on the reasonable findings by the trial judge discussed above, 114supported by our review of the record as a whole. As Mr. Wilson failed to complete the contract in a timely and workman like manner as he contracted to do, we find no error in the decision of the trial judge to deny his claim.
 

 As Mr. Rahman was the chief cause of the delays of which he complained and may have incurred some unnecessary expense in the manner in which he chose to supplant Mr. Wilson in the completion of the work, we find no error in the decision of the trial judge to deny his recon-ventional demand.
 

 Therefore, we find that there is a sufficient factual basis in the record to support the findings of the trial judge. Mindful of the fact that our duty of review is not completed by simply reading so much of the record as will reveal a reasonable factual basis for the findings in the trial court, we have further reviewed the record as a whole in order to determine whether the findings are manifestly erroneous/clearly wrong.
 
 Ambrose v. New Orleans Police Ambulance Serv.,
 
 93-3099 (La.7/5/94), 639 So.2d 216. Based on this review of the record as a whole, we find, as explained above, a reasonable factual basis for the findings in the trial court. We further find that none of the trial court’s findings is so contradicted by documentary evidence or is based on evidence or testimony that is so internally inconsistent as to be unworthy of belief as to permit this court to find manifest error in the findings of the trial judge.
 

 For the foregoing reasons, the judgment of the trial court is affirmed.
 
 [1]
 

 AFFIRMED.
 

 JONES, J., concurs in the result.
 

 [1]
 

 . We note that the record contains a notice to Mr. Wilson that he must remit to the clerk of the trial court the five dollar fax filing fee for his notice of appeal. Accordingly, this Court ordered Mr. Wilson to show cause why his appeal should not be dismissed for failure to pay facsimile filing fees as required by La. R.S. 13:850. By separate Order this Court declared itself to be satisfied with Mr. Wilson's response to the show cause order.